UNITED STATES of America, Plaintiff,

v.

Raymond Luc LEVASSEUR, Jaan Karl Laaman, Thomas William Manning, Richard Charles Williams, Carol Ann Manning, Patricia Gros and Barbara Curzi, Defendants.

No. 85 Crim 143.

United States District Court, E.D. New York.

Oct. 7, 1985.

John Gallagher, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y., for plaintiff.

William M. Kunstler, New York City, for Thomas William Manning.

Susan Tipograph, Flood, Tipograph & Holmes, New York City, for Patricia Gros.

Margaret Ratner, Center for Constitutional Rights, New York City, for Barbara Curzi.

Elizabeth Fink, Brooklyn, N.Y., for Carol Ann Manning.

Lynne Stewart, New York City, for Richard Charles Williams.

Jesse Berman, New York City, for Jaan Karl Laaman.

Robert Boyle, Brooklyn, N.Y., Legal Asst. to Levasseur.

Raymond Luc Levasseur, Metropolitan Correctional Facility, New York City, pro se.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

The defendants have moved this Court pursuant to Rule 12(b)(3) of the Fed.R. Crim.P. for an order suppressing physical evidence seized pursuant to a search warrant. The defendants contend that the af-

fidavit of an F.B.I. Agent based upon which the search warrant was granted contained statements which were knowingly and intentionally false or made by him with a reckless disregard for the truth and that a hearing to test their contentions is required by *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The defendants also contend that the affidavit failed to establish any connection between the items sought to be seized and the places to be searched. And finally, they contend that the information relied upon in the affidavit was stale. The defendants also contend that notebooks which were seized during the searches and which the government asserts contain incriminating information in code, were immune from seizure under the Fourth Amendment.

■ *Franks v. Delaware, supra,* decided that if a defendant makes a substantial preliminary showing that (1) the affidavit upon which a search warrant was granted contained false statements made knowingly and intentionally or with a reckless disregard for the truth and (2) if the allegedly false statement is necessary for the finding of probable cause, then the Fourth Amendment requires that a hearing be held at the request of the defendant. If the allegation of perjury or reckless disregard is established at the hearing by the defendant by a preponderance of the evidence and with the false material set aside, the remainder of the affidavit is insufficient to establish probable cause then the search warrant must be voided and the fruits of the search excluded as if probable cause was lacking on the face of the affidavit. The Court was careful to exclude from the embrace of the rule statements which were the result of police negligence in checking or recording facts relevant to a probable cause determination to avoid misuse of the hearing for purposes of discovery or obstruction. The Court was also careful to explain what was meant by a "substantial preliminary showing." It said, at p. 171, 98 S.Ct. at p. 2684:

There is ... a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any non-governmental informant.

■ If all those requirements are met and if setting aside the material that is the subject of the alleged falsity or reckless disregard there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. Only if the remaining content is insufficient, is the defendant entitled to a hearing.

With these principles in mind, I turn to the first prong of *Franks* which is—is there a substantial preliminary showing that the affiant made false statements knowingly and intentionally or with a reckless disregard for the truth. The statements alleged to be made intentionally with knowledge of falsity or with reckless disregard for the truth will be considered in the order in which they are set out in the affidavit of the defendant Levasseur, in support of this motion.

The affidavit in question was made by FBI Agent Leonard C. Cross on November 5, 1984. The defendants were arrested on November 4, 1984. Agent Cross was assigned in February 1984 to coordinate an extensive investigation which had been on-

going for many years into the alleged terrorist activities of the defendants. His affidavit was based upon his participation in the investigation, upon his familiarity with reports generated in the course of his investigation and upon his experience in such investigations. Mention in the discussion which follows to "Aceto" refers to Joseph Aceto; "Topsfield" refers to a transcript of an interview of Aceto by detectives of the Massachusetts State Police and FBI Agent Quigley in the Massachusetts State Police Barracks in Topsfield, Massachusetts on July 4–5, 1976; "Picariello" refers to Richard Picariello; "Carlson" refers to the transcript of the trial in *United States v. Carlson,* Cr. No. 76–26 (D.Maine 1976); "SMJJU" refers to the Sam Melville—Jonathan Jackson Unit.

### A. *The Suffolk County Courthouse Bombing*

1. In paragraph 23 of his affidavit Cross states that "After the bombing, Aceto spoke with Levasseur in an effort to obtain a portion of the blasting accessories which had previously been stockpiled by the original group. During this conversation Levasseur said, 'we used twelve sticks of dynamite.'" That statement is alleged to be falsely or recklessly made because Topsfield (pp. 2–19, 2–44) indicates that Aceto was told by Picariello that "they used twelve sticks;" that Levasseur never stated to him that they committed that crime (p. 2–45).

2. In that same paragraph, Cross attributes to Aceto a statement made to him by Levasseur in Calais, Maine, that the Suffolk County Courthouse would be an excellent bombing target after reading that probation records were stored there because the destruction of those records would prevent a reconstruction of the background of the persons whose records they were.

That statement is alleged to be false in that Aceto, in sworn testimony in *Carlson* said that he had neither heard nor mentioned the Suffolk County Courthouse before he heard about the bombing of it on the news.

Although there is no reference in the Cross affidavit to the Topsfield interview, it may or may not be fair to infer that much of the information in that affidavit came from that interview. There is nothing before the Court to indicate whether the information in the affidavit was derived from a reading of Topsfield by Agent Cross himself or whether the contents of Topsfield was conveyed to Cross by someone else who either read it or was present at the interview. There is also nothing before the Court to indicate when Cross read Topsfield (if at all) or when its contents were conveyed to him. It should be noted that a span of more than eight years separates Topsfield from the Cross Affidavit.

In any event, I find more than enough in Topsfield to minimize the significance of the first discrepancy seized upon by the defendants.

Immediately preceding the sentence in Topsfield reflecting that Picariello told Aceto that "They used twelve sticks," Picariello is said to have told Aceto, "They (Levasseur and Gros) told me to tell you if you ask that (the bombing) was done by the Jonathan-Jackson-Melville Unit" (Tr. p. 2–44).

There are many references to the SMJJU in Topsfield. For example, on page 81, Aceto identified Levasseur as the leader of the SMJJU, and on page 2–59 identified the members of the SMJJU as being Levasseur, Gros, Thomas and Carol Manning and three or four others.

On page 82 of Topsfield, Aceto states that Raymond Levasseur was the man who placed the bomb at the Courthouse in Boston and that Pat Gros made the threats, the phone calls.

■ Viewing the statement attacked in the context of the Topsfield transcript in its entirety, one can only say that it is a trifle and does not demonstrate that the affidavit statement was deliberately false or recklessly made in that respect. Affidavits are not read "with the same microscopic intensity as municipal bond counsel would a

bond indenture." *United States v. Pond,* 523 F.2d 210, 214 (2d Cir.1975).

As to the second inaccuracy of which mention was already made, whether Cross' failure to refer to that excerpt from the *Carlson* trial which was some nine years prior to his affidavit was one that was knowing and intentional or reckless would depend upon Cross' familiarity with the entirety of the *Carlson* transcript and if he had any familiarity with it, whether he had any recall of that excerpt when he made his affidavit and what he understood the excerpt to convey.

### B. *The Red Star North Brigade*

In paragraph 11 of his affidavit, Cross attributes to Aceto the information that during 1974 Levasseur, Gros and Manning formed the Red Star North Collective, a bookstore in Portland, Maine and that the same persons were members of the Red Star North Brigade. In paragraph 12, Cross states that Aceto agreed to join a group of which Levasseur and Manning were the leaders, which Aceto "later came to know as the Red Star Brigade." In paragraph 21, Cross makes another reference to the Red Star North Brigade, the original members of which were Levasseur, Gros, Carol and Thomas Manning and that the group later became known as the SMJJU.

These statements are alleged to be false because (1) Topsfield contains no reference to an entity called the Red Star North Brigade; (2) Aceto denied that the group he belonged to had a name prior to the formation of the SMJJU. It is claimed that Cross deliberately fabricated the name Red Star North Brigade to "invoke images" (presumably in the mind of the Magistrate) "which would make Cross' later speculations pass muster." (Levasseur Aff. p. 10).

■ A careful reading of Topsfield reveals that Aceto identified a photograph purporting to portray the members of a "Red Star North Collective." Tr. 2–47–49. Relying again upon the teaching of *United States v. Pond, supra,* the discrepancy between "collective" and "brigade" is a trifle

which does not demonstrate that the affidavit was deliberately false or reckless.

### C. *The York Beach Meeting*

In paragraph 12 of his affidavit, Cross relates a meeting at York Beach, Maine, to which Aceto was summoned by Levasseur and Manning at which Aceto was advised that the bombings would be carried out against targets viewed as instruments of an oppressive United States Government. Aceto was also advised at that meeting that the operation would be financed by bank robberies and that if he joined, Aceto's life style would change in that he would thereafter live underground.

These statements are alleged to be false in that neither Topsfield nor *Carlson* reflect the "ideological content" of the meeting presented in the Cross affidavit, nor do they indicate that Levasseur and Manning were the leaders of a group committed to the bombings and bank robberies.

A careful reading of Topsfield and *Carlson* does not support the assertion of deliberate falsity or reckless disregard for the truth attributed to paragraph 12 of the Cross affidavit. Aceto did say that he was contacted by Levasseur and Manning and was asked to meet them at York Beach (Topsfield, 2–69). He said that Levasseur knew that he (Aceto) was interested in "doing some political activities" and wanted to know where I stood (Topsfield p. 2–70). He also stated that the conversation took place with Levasseur and that robbing banks and bombings ("How do you feel about blowing up places") was discussed as was living underground (Topsfield 2–70). Similarly, a careful reading of *Carlson* reflects the bank robbery and bombings were discussed (*Carlson,* pp. 103–104).

■ The only discrepancy between the Cross affidavit and Topsfield and *Carlson* (assuming that all the information available to Cross came from those sources only) relates to the "ideological content" assertion which again, I find, is a discrepancy so lacking in material significance as to fail to

justify the conclusion of deliberate falsity or reckless disregard.

### D. *The Portland, Maine Bank Robbery*

Paragraph 6 of the Cross affidavit recites that approximately $11,000 was taken from the Northeast Bank of Westbrook, Lunts Corner Branch, Portland, Maine.

The falsity alleged is that Topsfield indicates that $2,200 was taken. The government's memorandum (p. 24) asserts that in *United States v. Barrett* which involved this bank robbery, it was explained that $11,000 was taken, but approximately $9,000 was dropped as the robbers ran for their getaway car. See Also Exhibit N, page 9 (Cross Affidavit, March 21, 1985), attached to the Levasseur affidavit and Topsfield, p. 2–81.

■ The discrepancy of the dollar amount is satisfactorily explained and does not support an assertion of deliberate falsehood or reckless disregard.

### E. *The Augusta, Maine Bank Robbery*

In paragraphs 14–16 of the Cross affidavit reference is made to the robbery of the Civic Center Branch of the Bank of Maine as having occurred, Aceto said, on December 12, 1975. Participating in that robbery were Levasseur, Aceto, Thomas and Carol Manning, who drove the getaway car.

The falsity alleged is that in Topsfield at p. 2–98, Aceto said the bank robbery occurred on November 8, 9 or 10.

■ If, in fact, the robbery occurred on November 8, 9 or 10 instead of December 12, 1975, the discrepancy is a "trifle" which does not demonstrate that the affidavit was deliberately false. *United States v. Pond*, 523 F.2d 210 (2d Cir.1975). In paragraph 21(d) of Exhibit N (Affidavit of Cross, dated March 21, 1985) attached to the moving papers, the December 12, 1975 date is asserted as being correct.

### F. *Explosives and Training*

Paragraph 19 of the Cross affidavit states that Aceto was given extensive instruction regarding bombs by Levasseur and that Aceto saw many books and pamphlets relating to explosives in Levasseur's residence.

The falsity alleged is that Topsfield contains no such account. It is also alleged that Cross, in par. 19 falsely recites that Levasseur instructed Aceto in the use of weapons. Par. 19 does not contain such an assertion. It is also alleged that in *Carlson*, Aceto testified that he received no training in weapons or explosives.

The assertion attributed to Aceto is, indeed, contradicted by Aceto's testimony in *Carlson*. The significance of this assertion to the *Franks* motion will be discussed below.

### G. *Red Star North Book Store*

■ Paragraph 11 of the Cross Affidavit refers to a Red Star North Collective bookstore in Portland, Maine.

That fact is alleged to be false. Topsfield indicates Aceto placing the store in Cambridge, Massachusetts. This insignificant discrepancy would not demonstrate that the affidavit was deliberately false.

### H. *101 St. Marks Place*

■ In paragraph 13 of Cross affidavit, reference was made to an apartment in Greenwich Village which was rented by Patricia Gros and another woman.

The falsity alleged is that Topsfield makes no mention of any person as having rented the apartment. This, too, is a trifle which does not demonstrate that the affidavit was deliberately false.

### I. *Aceto's Reliability*

The Cross affidavit describes Aceto as a protected government witness (par. 6); a bank robber (pars. 6–8, 14–17); as one involved in bombings (par. 9); as having been convicted of assault with intent to murder (par. 11); a cooperating government witness (par. 11).

It is alleged that Cross deliberately omitted to inform the Magistrate that: (1) Aceto committed a crime while a protected

witness and for which he was convicted and incarcerated in Arkansas; (2) Aceto murdered another inmate while so confined and was convicted of that crime; (3) Aceto has an extensive psychiatric history; (4) Aceto had attempted suicide and was a drug and alcohol abuser; (5) Aceto was an informant for the Portland, Maine Police Department and lied about in the trial of *United States v. Picariello;* (6) Aceto had extensive criminal history, pleaded guilty to numerous crimes and received numerous benefits in exchange for his testimony in various trials. This will be discussed below.

### J. *The North Attleboro, Massachusetts Incident*

Cross' affidavit (pars. 45–49) describing a shootout in North Attleboro, Massachusetts asserts that Christopher King who was arrested at the time, identified Laaman as the driver of the vehicle involved in the shootout.

It is alleged upon information and belief that this allegation is completely false. The government has submitted a report prepared by Massachusetts State Trooper Paul Landry which does recite that King identified Laaman as being with him in the vehicle and that he escaped.

### K. *The Lamonaco Murder*

Paragraphs 32–34 of Cross' affidavit relates the murder of State Trooper Phillip Lamonaco for which warrants of arrest were issued for Williams and Thomas Manning.

■ It is alleged that the affidavit fails to mention divergent witness accounts of the murder. This claim is not adequate to support a *Franks* hearing. The affidavit contains more than sufficient information which is not contested, to justify consideration by the Magistrate.

### L. *Laaman-Curzi Residence*

In Cross' affidavit, paragraphs 53–54 state that during a protective sweep of the Laaman-Curzi residence, a shoulder weap-

on, three automatic weapons and black powder were found in plain view.

The affidavit is alleged to be false in that the weapons were not in plain view.

### M. *The Jefferson-Ohio Search*

The Cross affidavit states that the Manning residence was located by subsequent investigation. That investigation, it is claimed, consisted of the interrogation of the Levasseur-Gros children which is alleged to be illegal. This claim will be dealt with elsewhere.

### *The Norfolk, Virginia Searches*

On April 25, 1985, Cross executed an affidavit in support of an application for a search warrant for 134 Conway Street, Norfolk, Virginia and for a 1977 Chevrolet, being the residence and automobile of Mr. and Mrs. Thomas William Manning. The defendants allege that the information contained in this affidavit is derived from information obtained following the Ohio searches and seizures. They therefore request that the items seized in this search be suppressed if the Court finds that the search and seizure in Ohio were unlawful.

■ Have the defendants made a substantial showing that false statements were knowingly and intentionally made or made with a reckless disregard for the truth and included by Cross in the warrant affidavit? In this regard, the omission of material facts as well as material misrepresentations are properly considered. *United States v. Ferguson,* 758 F.2d 843 (2d Cir.1985); *United States v. Tufaro,* 593 F.Supp. 476, 485 (S.D.N.Y.1983); *United States v. Marin-Buitrago,* 734 F.2d 889, 895 (2d Cir.1984).

As has already been indicated in the course of the analysis of each claimed false or reckless statement, for the most part they concern discrepancies which are too minor to support a contention of knowing and intentional falsehood or reckless disregard for the truth. For example, it is hardly material to the existence of probable cause whether a statement is said to have been made directly to Aceto by Levasseur

or made indirectly to Aceto through Picariello. It is the description of the criminal activity that is significant, not whether it was said to Picariello rather than Aceto. The reference to Red Star Brigade rather than Red Star Collective or Red Star Bookstore is not material to a finding of probable cause and the assertion that it was designed to create some image in the mind of the Magistrate is purely fanciful. Whether or not the discussion of York Beach had as one of its components an ideological content is insignificant as is the fact whether Manning was present throughout the discussion or was on a walk at the time. What is significant is the assertion that Aceto was summoned to York Beach by Levasseur and Manning and the asserted discussion of bombings and bank robberies and living underground. As to the Portland, Maine bank robbery, whether the amount taken was $11,000 or $2,200, it was the bank robbery, not the amount it yielded that is significant although as has been indicated, there is no discrepancy here at all. So too, whether it was November 8, 9 or 10 or December 12 when the bank in Augusta was robbed is a mere discrepancy which should not eclipse the fact that the bank was robbed, although here, too, there may be no discrepancy at all.

Again, whether the Red Star North Bookstore is in Portland or Cambridge is hardly significant. Equally insignificant is whether an apartment in Greenwich Village was or was not rented by Patricia Gros, *see United States v. Mankani*, 738 F.2d 538 (2d Cir.1984).

The submission by the Government of the report prepared by Massachusetts State Trooper Paul Landry confirms the accuracy of the Cross affidavit regarding the North Attleboro, Massachusetts incident. The failure to detail the diverse accounts of witnesses to the Lamonaco murder is not material and would not affect probable cause given the fingerprints of Manning and Williams said to be found in the car along with Manning's driver's license with his photograph on it.

As to the Laaman-Curzi residence, whether the items seized were in "plain view" as that term is used in the law of search and seizure is a legal question which is not free from difficulty. That they were in "plain sight" and exempt from the exclusionary rule would surely suffice.

Although not explicitly made the subject of a motion under Rule 12(b)(3) of the Fed. R.Crim.P., the legality of the seizure of the items described in the Cross affidavit, par. 53, has clearly enough been put in issue by the defendants and I will regard such a motion as having been made and will hold a hearing for the purpose of determining whether the items mentioned in that paragraph should be suppressed.

The contention that the search of the Jefferson, Ohio residence was unlawful for the reasons indicated has no merit and I will address that separately.

In a reply affidavit, Levasseur says that he believes that "every word that comes from the mouth of Joseph Aceto is a lie, including the words "a" and "the." That broadside attack is not enough to mandate an evidentiary hearing. *Franks* teaches that the attack must be more than conclusory and should point out specifically the portions of the warrant affidavit that is claimed to be false. Levasseur has done that and to the extent that he has, his contentions were addressed.

I have not addressed Aceto's testimony in *Carlson* that he neither heard nor mentioned the Suffolk County Courthouse before he heard about the bombing on the news; and his contradictory statement in *Carlson* that he received no training in weapons or explosives. I have also not addressed the issue of Aceto's reliability— that is, whether material information pertaining to Aceto's background was knowingly and intentionally or recklessly withheld from the Magistrate.

The second prong of *Franks* requires me to determine whether the allegedly false statements were necessary to the finding of probable cause before a hearing would be required. That is, an affidavit that con-

tains both lawful and tainted allegations is valid if the lawful information, considered independently, supports probable cause. The ultimate inquiry is not whether the affidavit contains false allegations or material omissions, but whether after putting those aside, there remains a residue of independent and lawful information sufficient to support probable cause. *United States v. Ferguson,* 758 F.2d 843, 848 (2d Cir.1985). The examination of that residue of independent and lawful information should lead to a practical, common sense decision whether, given all the circumstances set forth in the affidavit there is a fair probability that contraband evidence of a crime will be found in a particular place. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The duty of the reviewing court is simply to assure that the Magistrate had a substantial basis for concluding that probable cause existed.

In that regard, whether Aceto did or did not receive instruction in weapons and explosives would not be determinative on the issue of probable cause nor would his seeming contradiction as regards the Suffolk County Courthouse. Both instances of claimed discrepancies go to Aceto's credibility which has been attacked, as has been indicated, with respect to other alleged discrepancies I have already considered. That brings me to the issue of the alleged failure to advise the Magistrate of certain facts relating to Aceto's background.

In a similar motion made before the United States District Court for the District of Maine, in the case of *United States v. Levasseur,* 609 F.Supp. 849 (D.Me.1985), a *Franks* hearing was granted. There is no complete identity of parties in that case nor are the crimes charged the same. The Court made its determination to grant a

Franks hearing, recognizing that he did not address the second prong of Franks before doing so. The Court reasoned that only after a determination as to which of the affiants' assertions were supported and which were not could a decision be reached as to whether the residue supported a finding of probable cause. The cross-affidavit before the Court in Maine and here is the same. It is less clear whether the Court had Topsfield before it. A hearing was never held for the reason that the issue became moot. The defendants argue that I am estopped collaterally by that Court's determination to hold a Frank hearing. I disagree. One of the prerequisites to the applicability of the collateral estoppel doctrine is that the issue to be estopped has been finally determined on the merits. Crucial to the existence of that requirement is that the earlier ruling be appealable.[1] The Maine Court's determination to hold a Franks hearing and nothing more, was not an appealable order. It did not suppress evidence. *See* 18 U.S.C. § 3731.

▪ I find that the omission to advise the Magistrate of events occurring to Aceto after Topsfield, namely, that he committed other crimes, abused drugs and alcohol, etc., does not bring into play the second prong of Franks, i.e., that that information was necessary to a finding of probable cause.

The Cross affidavit clearly informed the Magistrate that Aceto was in the witness protection program, that he was a cooperating witness, that he was a bank robber, was involved in bombings; and was convicted of assault with intent to murder. Questions concerning his reliability would clearly enough have been called to the attention of a detached and neutral Magistrate making a practical, common sense

---

1. In *United States ex rel. DiGiangiemo v. Regan,* 528 F.2d 1262 (2d Cir.1975) (Friendly, J.) the Court addressed the issue of finality as follows, at page 1265:

> For purposes of issue preclusion, 'final judgment includes any prior adjudication of an issue in another action between the parties that is determined to be sufficiently firm to be accorded conclusive effect,' (citations omitted).... Factors supporting a conclusion that

a decision is final for this purpose are 'that the parties were fully heard, that the Court supported its decision with a reasoned opinion, [and] *that the decision was subject to appeal or was* in fact reviewed on appeal.' (Emphasis added).
*See also Laughlin v. United States,* 344 F.2d 187, 191 (D.C.Cir.1965); *Rodriguez v. Beame,* 423 F.Supp. 906 (S.D.N.Y.1976).

appraisal of the affidavit before him. The information furnished by Aceto in 1976 appears sufficiently corroborated by events thereafter. *United States v. Perry*, 643 F.2d 38, 50 (2d Cir.1981). Those events are recounted in the Cross affidavit without reference to a reliance upon information supplied by Aceto. The papers in support of the motion, interestingly, make no reference to those Cross affidavit paragraphs which are as follows:

24. During the period April 22, 1976 through October 27, 1978 a series of six bombings and one attempted bombing took place in Massachusetts. They are listed below. Following each of those bombings a group identifying itself as the Sam Melville-Jonathan Jackson Unit issued typewritten communiques wherein the members claimed credit for each of the bombings:

| COMMUNIQUE NO. | PLACE | DATE | EXPLOSION |
|---|---|---|---|
| 1 | Suffolk County Courthouse Boston, Massachusetts | 04–22–76 | 9:12 a.m. |
| 2 | Middlesex County Courthouse Lowell, Massachusetts | 06–21–76 | 6:15 a.m. |
| 3 | First National Bank Revere, Massachusetts | 07–04–76 | 9:46 p.m. |
| 4 | Union Carbide Company Needham, Massachusetts | 12–12–76 | Did not detonate |
| 5 | W.R. Grace Company Marlboro, Massachusetts | 03–12–77 | 8:24 p.m. |
| 7 | Mobil Oil Corporation Waltham, Massachusetts | 10–27–78 | 9:30 p.m. |
| 7 | Mobil Oil Corporation Wakefield, Massachusetts | 10–27–78 | 9:30 p.m. |
| 8 | Mobil Oil Eastchester, New York | 02–27–79 | 3:30 p.m. |

25. It is estimated that between ten and twenty sticks of dynamite were used in each of the bombings for which the Sam Melville-Jonathan Jackson Unit claimed credit. The explosive device left at the Union Carbide installation in Needham, Massachusetts on December 12, 1976 did not detonate. Massachusetts State Police explosive technicians who disarmed that device, found it to contain twenty sticks of dynamite.

THE LATER BOMBINGS

26. Beginning in December, 1982, and continuing through October, 1984, a group calling itself the United Freedom Front has claimed responsibility in communiques for the following nine bombings taking place in the vicinity of New York City:

| COMMUNIQUE NO. | PLACE | DATE | TIME |
|---|---|---|---|
| 1 | IBM Harrison, New York | 12/16/82 | 7:40 p.m. |
| 1 | S. African Purchasing Office, Elmont, New York | 12/16/82 | 7:40 p.m. |
| 2 | Theodore Roosevelt Reserve Center, Uniondale, Long Island, New York | 5/12/83 | 11:22 p.m. |

| COMMUNIQUE NO. | PLACE | DATE | TIME |
|---|---|---|---|
| 2 | Naval Reserve Center Queens, New York | 5/13/83 | |
| 3 | Sgt. John Muller Army Reserve Center | 8/21/83 | 11:30 p.m. |
| 4 | Navy Recruiting Dist. Office E. Meadow, New York | 12/13/83 | 11:39 a.m. |
| 5 | Honeywell Corp. Queens, New York | 12/14/83 | Did not detonate |
| 7 | Motorola Queens, New York | 1/29/83 | 10:04 p.m. |
| 8 | IBM Harrison, New York | 3/19/84 | 10:42 p.m. |
| 9 | General Electric Melville, L.I. New York | 8/22/84 | 12:00 p.m. |
| 10 | Union Carbide Tarrytown, New York | 9/26/84 | 9:30 p.m. |

27. We believe that Levasseur and his associates are responsible for these bombings for the following reason: First, the communiques of the United Freedom Front use similar language and express similar themes as found in the communiques of the Sam Melville-Jonathan Jackson Unit. Moreover, each of the communiques issued by the Sam Melville-Jonathan Jackson Unit were numbered *seriatum* as were the United Freedom Front communiques. Also, both groups issued a Communique No. 6 which did not correspond to a bombing, but instead contained a warning as to future bombings and urged that future telephonic warning calls should be taken seriously. Secondly, the FBI Explosives Unit has compared the unexploded device found at Union Carbide in Needham, Massachusetts, on December 12, 1976, with the unexploded device seized at Honeywell Corporation in Queens, New York, on December 14, 1983. The FBI Explosives Unit has concluded that the similarities between the two devices suggest that they were made by the same person, or by persons using the same plans. Thirdly, a January, 1982 search of a vacated Manning residence in Marshall's Creek, Pennsylvania, (see below) resulted in the seizure of a notebook containing what appears to be a listing of companies. Several of the corporations listed above appear on the list, with information on locations and routes to and from the locations.

## THE OCTOBER, 1981, VERMONT ASSAULT

28. On October 5, 1981 Raymond Luc Levasseur entered the Brattleboro, Vermont, Town Clerk's Office in an attempt to secure a copy of a birth certificate in the name of Ann Marie Touchette, a female born on August 25, 1948, who died August 26, 1948. Levasseur, who was later determined to have assumed the identity of a deceased infant male, was confronted by Lt. Richard Guthrie of the Brattleboro Police Department in order that Guthrie might make a determination as to Levasseur's reason for requesting the birth certificate of a deceased female infant. After his being confronted by Lt. Guthrie, Levasseur removed what is believed to have been a 9mm automatic handgun from beneath his jacket and forced Lt. Guthrie along with the employees of the Brattleboro Town Clerk's Office to the floor. Levasseur then removed Lt. Guthrie's service revolver and fled the area of the Brattle-

boro Town Clerk's Office driving what was determined to be a 1978 Chevrolet Malibu sedan, bearing Connecticut license WC–2042, registered in the name of John J. Boulette, at 1151 Chapel Street, New Haven, Connecticut. Levasseur abandoned that vehicle at a rest area south of Brattleboro on Interstate 91.

29. A subsequent search of the vehicle used by Levasseur determined that Levasseur had been using the false identity of John J. Boulette, a deceased infant, born August 10, 1947 at Framingham, Massachusetts and died September 30, 1947. A report by the Identification Division of the FBI on November 13, 1981 states results of an examination of various items recovered from the vehicle which was abandoned by Levasseur on October 5, 1981 at Brattleboro, Vermont, determined that Levasseur's fingerprints were located on several maps recovered from the glove box of that vehicle.

30. On December 3, 1981, Vermont District Court Judge Paul Hudson, Brattleboro, Vermont, issued a felony warrant charging Levasseur with assault and robbery and possession of a firearm during the commission of a felony, in violation of Title 13 Vermont Statutes Annotated, Sections 608(b) and 4005.

31. Raymond Luc Levasseur has the following criminal record: arrested February 7, 1969 in Tennessee for sale of marijuana, sentenced to a term of five years incarceration at the Tennessee State Penitentiary, Nashville, Tennessee; arrested March 12, 1975 (with Cameron David Bishop) at East Greenwich, Rhode Island for (1) possession of sawed-off shotguns (4 counts), (2) carrying a pistol without a license, (3) conspiracy to commit robbery of an armored car, and (4) receiving stolen goods.

### THE LAMONACO MURDER

32. On December 21, 1981, a lone New Jersey State Trooper on Interstate 80 in Warren County, New Jersey, stopped a vehicle occupied by two males. The stop appeared to be routine. The New Jersey State Trooper, Phillip J. Lamonaco, was shot to death by the occupants of this vehicle. The murder weapon was a 9mm automatic; trooper Lamonaco had been shot eight times. A short time later, the vehicle was discovered a short distance away from the shooting.

33. Subsequent investigation disclosed that the two occupants of the vehicle were Thomas Manning and Richard Williams. Manning was tied to the vehicle through a driver's license which had been left in the vehicle. Although the driver's license was in a false name, the photograph on the driver's license was that of Manning. Manning was also connected to the automobile by fingerprints. Williams was tied to the vehicle through fingerprints found on items left in the car when it was abandoned.

34. On January 19, 1982, the New Jersey State Police obtained a warrant charging Richard Charles Williams with the murder of New Jersey State Police officer Phillip J. Lamonaco, in violation of New Jersey State Penal Law Section 2C; 11–3 (murder). On January 21, 1982 Federal warrants were issued at Newark, New Jersey charging Richard Charles Williams and Thomas William Manning with violation of the Unlawful Flight to Avoid Prosecution Statute, 18 U.S.C., Section 1073.

34a. Richard Charles Williams has the following criminal record: arrested January 18, 1964 at Salem, Massachusetts for stealing an automobile, referred to the Youth Service Board; arrested October 19, 1967 at Salem, Massachusetts for illegal possession of narcotics, sentenced to six months in jail; arrested November 15, 1968 in Massachusetts, for illegal possession of marijuana, sentenced to two years to be served concurrent with sentence served at time; arrested January 29, 1971 at Portsmouth, New Hampshire for armed robbery and larceny of a motor vehicle, sentenced to term of seven to fifteen years. On March 6, 1972 Williams, in the District of Massachusetts, was sentenced to a term of two years for the unlawful selling of marijuana, a sentence which was to run concur-

rently with the sentence in New Hampshire of seven to fifteen years. Williams was paroled on the New Hampshire sentence on October 31, 1974. Williams' next arrest was on January 3, 1978 by the Boston Metropolitan Police Department for possession of marijuana with intent to sell; however, no disposition of these arrest charges is listed. The final arrest listed for Williams was on June 21, 1979 at Malden, Massachusetts where Williams was arrested (with Leo Francis Feeley) for breaking and entering during the day time. No disposition of this charge was listed on Williams' FBI identification record.

## THE MANNING SEARCH

35. Investigation determined that Manning, using an alias, along with his wife, Carol Ann Manning, and their three children, had moved into a farm house located on Brushy Mountain Road, Marshall's Creek, Pennsylvania, during February, 1981 and had resided at that location until December, 1981.

36. On January 3, 1982 representatives of the New Jersey and the Pennsylvania State Police executed a search warrant on Manning's residence in Marshall's Creek. A search of the immediate area surrounding the Manning residence located numerous spent ammunition, cartridges and bullets. Also recovered from Manning's residence was a photo album which contained various photographs of Thomas and Carol Manning, and Raymond Luc Levasseur and his common-law wife Patricia Gros. Found in the search was a single sheet of lined notebook paper, approximately 3″ × 5″ in size, recovered from a plastic bag containing various articles of clothing left in the living room of Manning's residence. Handwritten notes on this sheet of note paper included the following:

  a.  bread $ box

  b.  rev. .22 trunk

  c.  sticks in brn. trunk caps in blk. trunk top attic

  d.  bag in attic w/pump & vest, and another top closet or trunk

  e.  HK in trunk w/mags.

37. Based upon a review of the items referred to on the note as listed above, we believe that this note served as a reminder for Thomas Manning or one of his associates regarding certain items which should be retained prior to departure from the Marshall's Creek residence. Item a. is believed to refer to certain money which was stored in a bread box, while item b. evidentally refers to a .22 caliber revolver which at one time was stored in a trunk. Item c. seems to refer to sticks of dynamite and blasting caps which were stored in separate storage trunks. Your affiant knows that it is common practice in the explosives business to store dynamite and blasting caps in separate locations in order to prevent accidental discharge of a blasting cap, which in turn would cause detonation of the dynamite. Item d. is believed to refer to a pump shotgun along with a bullet-proof vest. Item e. is thought to refer to a Security Arms Company, model HK 93 assault rifle and magazines of .223 caliber ammunition used in an HK 93 assault rifle.

38. An upstairs room of Manning's residence in East Stroudsburg, Pennsylvania was believed to have been utilized as a gun workshop. Recovered in that room during the search of January 3, 1982 was a piece of note paper containing the following notations:

  lead azid-blasting caps

  devastator bullets

  old elec. blasting caps for test?

  12–20?

39. Additionally, the search of the Manning residence disclosed that a bedroom had been occupied by Richard Williams. The room contained his personal belongings, including an address book with phone numbers of persons associated with and related to Williams.

## THE LEVASSEUR SEARCH

40. On January 13, 1982 members of the Pennsylvania and New Jersey State Police executed a search warrant on Levasseur's recently vacated residence located in Germansville, Pennsylvania. Investi-

gation provided information from witnesses living in the area that Levasseur and his family began residing at the Germansville residence on or about October 22, 1981. Certain items of revolutionary literature were located within Levasseur's residence along with empty ammunition boxes for 9mm and .223 caliber ammunition. Manning's and Williams' fingerprints were also found in the residence.

## PLANNED ARMORED CAR ROBBERIES

41. Also located within Levasseur's residence was a note containing the writing "153 Brinks, Route 2 between S.J. and Danville, St. Johnsbury, VT." This note relates to what has been determined to be a route previously travelled by a Brinks Armored Car Service in the St. Johnsbury, Vermont area. Two United States geological survey maps of the Lower Waterford and St. Johnsbury, Vermont and northern New Hampshire areas were also recovered from Levasseur's residence. Lower Waterford, Vermont is a small community located adjacent to Vermont Route 18 approximately eight miles to the southeast of St. Johnsbury, Vermont.

42. On January 30, 1982, Donald McLoud, Assistant Manager, Brinks, Inc., Dorchester, Massachusetts stated that Brinks previously operated an armored car service in the northern Vermont area; however, the operation was terminated during May, 1981 after a competitor underbid Brinks prices which caused the loss of several large accounts and thereafter the closing of the business. McLoud advised that during the period Brinks operated in northern Vermont the business included several accounts which were serviced in the St. Johnsbury, Vermont area. The armored cars which were utilized to service the accounts in the St. Johnsbury, Vermont area travelled between Burlington, Vermont and St. Johnsbury, Vermont and utilized Vermont State Route 2 in order to service these accounts.

43. The search of Manning's car located at a garage near Marshall's Creek Pennsylvania located certain papers relating to the route travelled, along with the specific truck number, for a Purolator Armored Car Service at Allentown, Pennsylvania. Marshall's Creek and Germansville, Pennsylvania, the location of the Levasseur residence, are rural communities surrounding the Allentown, Pennsylvania area. The search of Manning's residence additionally located numberous newspaper articles relating to the attempted armed robbery of the Brinks Armored Car in Nanuet, New York on October 20, 1981, during which two police officers and one Brinks guard were slain. Included within these newspaper articles were various handwritten notes evaluating the robbery attempt.

44. In view of the information set forth above, we believe that: (1) Levasseur, Manning and certain other individuals were planning the armed robbery of an armored car service in Allentown, Pennsylvania; however, the untimely incident involving New Jersey State Police Officer Lamonaco caused their premature departure from the area prior to the completion of their intended task, and: (2) Levasseur, Manning and others previously compiled certain information relative to planning an armed robbery of a Brinks armored car servicing the St. Johnsbury, Vermont area.

## ATTEMPTED MURDER: NORTH ATTLEBORO, MASS.—FEBRUARY 7, 1982

45. On February 7, 1982, at approximately 2:00 a.m. on the morning of February 7, 1982 Massachusetts State Police Officer Paul Landry entered the southbound rest area of Interstate 95 at North Attleboro, Massachusetts where he observed a green 1978 Plymouth station wagon bearing Massachusetts license 988–FKK; in it were two individuals who appeared suspicious to Officer Landry. Officer Landry approached the vehicle and he observed that the two individuals were male, one white and one black. Also in the vehicle was a doberman pinscher. Officer Landry described the driver of the vehicle as a white male, approximately 5'10" in height,

weighing 200 pounds, having brown curly hair. The driver furnished a New York driver's license in the name of Salvatore Bella. The second individual in the vehicle, who Officer Landry described as being a black male, furnished a New York driver's license in the name of Lester Jordan. During his initial confrontation with these individuals, Officer Landry noted that the black male kept his hand near the waistband area of his trousers when Officer Landry was near them. Officer Landry, therefore, suspected that that individual might have a handgun hidden on his person. Officer Landry returned to his cruiser and radioed for assistance.

46. Massachusetts State Police Officer Michael Crosby arrived at the North Attleboro rest area in response to Officer Landry's request for assistance. Both police officers then confronted the black male who was sitting as a passenger in the vehicle, whereupon they immediately recognized that he was wearing a bullet-proof vest. When they began to frisk him for their own protection, they located a 9mm automatic pistol in his waistband. When they disarmed the passenger, the driver of the vehicle exited the vehicle and began to run for the cover of a garbage dumpster. He fired several shots at both police officers, one of which struck one of the cruisers. The driver of the vehicle was able to effect his escape under the cover of darkness; however, the passenger of the vehicle was placed under arrest. He was subsequently identified as Christopher Everett King, a close associate of both Richard Charles Williams and Jaan Karl Laaman.

47. A search of the vehicle bearing Massachusetts license 988–FKK located a .45 caliber semi-automatic carbine containing 31 rounds of hollow-point ammunition, a 12-guage Ithaca automatic shotgun fully loaded with seven rounds of ammunition; and a .380 caliber automatic handgun. Subsequent to his arrest King was transported to the Foxboro, Massachusetts barracks of the state police for questioning and detention. During questioning by Massachusetts State Trooper James O'Connor, King admitted that Jaan Karl Laaman was the driver of the vehicle.

48. On February 12, 1982 a physical search of the interior of the 1978 Plymouth station wagon following its recovery at North Attleboro, Massachusetts located an envelope containing two color photographs of Jaan Laaman.

49. On February 7, 1982 an arrest warrant was issued for Jaan Karl Laaman charging him with two counts of assault with intent to commit murder in violation of Massachusetts General Laws, Chapter 265, Section 15. On February 18, 1982 a Federal warrant charging Laaman with violation of the Unlawful Flight to Avoid Prosecution Statute, Title 18, U.S.C., Section 1073, was issued at Boston, Massachusetts.

50. Jaan Karl Laaman has the following criminal record: arrested June 24, 1966 at Elmira, New York for first degree robbery, sentenced to term of 31 days; arrested October 21, 1971 at Canandaigua, New York for possession of dangerous drugs, sentenced to term of ten days county jail; arrested February 16, 1972 at Manchester, New Hampshire for willful damage of public property (explosives), sentenced to term of 14 to 20 years (paroled August 7, 1978), and a Federal sentence on March 8, 1972 of five years for using explosive devices to run concurrent with state sentence.

## SURVEILLANCES ON NOVEMBER 3, 1984

51. On November 3, 1984, Patricia Gros was positively identified as driving a 1979 Chevrolet van bearing Ohio license N40A5J. This vehicle was followed to a residence located at 1903 State Route 225, Deerfield, Ohio, where surveillance was then maintained on that residence.

On the evening of November 3, 1984, Richard Williams was identified as the driver of a brown Buick Park Avenue (North Carolina license plate numbered DPS923). This car was followed as it left the residence at 1903 State Route 225 in Deerfield, Ohio. The car driven by Richard Williams

was followed into Cleveland and onto West 22nd Street.

### ARRESTS ON NOVEMBER 4, 1984

52. On the morning of November 4, 1984, Raymond Levasseur and his wife, Patricia Gros, were arrested after departing their house at 1903 State Route 225, Deerfield, Ohio, a home rented by Patricia Gros since July, 1983. The 1979 Chevrolet van bearing Ohio license N40A5J, in which Levasseur and Gros were arrested, was secured pending issuance of a search warrant.

53. On November 4, 1984, Richard Charles Williams and Jaan Karl Laaman were arrested at 4248 West 22nd Street, Cleveland, Ohio. FBI Agents and local law enforcement officers then conducted a protective sweep of this home for other associates of Raymond Luc Levasseur and Thomas Manning. During this sweep, Agents and officers located, in plain sight, one shoulder weapon, three automatic weapons and black powder. Following his arrest and his being Mirandized, Williams stated to FBI Agents that law enforcement would "find what's in the house anyway" when responding to a question concerning guns in the house. He also stated that he would have "shot it out" if he had gotten to his car because he had a gun and bullet-proof vest there.

54. Following the arrests of Williams and Laaman, the following vehicles were located in the driveway at 4248 West 22nd Street, Cleveland, Ohio: the aforementioned 1980 Buick; a 1976 Oldsmobile station wagon, Ohio license number QPW885, VIN 3J35R6D217265, and a 1983 Mercury Marquis, New York license number 6879 ALL, VIN 1MEBP95F9DZ661273. The 1976 Oldsmobile station wagon is registered to a Mary Elizabeth Brennan, 8075 Hetz Street, Cincinnati, Ohio. Budget Mail Box Center, Blue Ash, Cincinnati, is located at the 8075 Hetz Street address. The 1983 Mercury Marquis is registered to a Howard Sorett, Bronx, New York. When Laaman was arrested he was carrying numerous items of false identification in the name of Howard Sorett. These vehicles were secured pending issuance of a search warrant.

■ That information in the Cross affidavit alone, furnished more than sufficient probable cause to issue the warrant in question.

The information relied upon in the affidavit was not stale. Evidence on both sides of the seven or eight year gap related to the ongoing activities of the defendants. *See*, e.g., paragraph 27—similarity between unexploded devices in 1976 and 1983. The question of staleness is answered by reference to the nature of the unlawful activity alleged in the affidavit rather than by reference to dates and times. Where the affidavit recites facts indicating activity of a protracted nature—a course of conduct— the passage of time becomes less significant. *See*, e.g., *United States v. Harris*, 482 F.2d 1115, 1119 (3d Cir.1973).

■ The defendants' contention that the Cross affidavit did not establish a sufficient nexus between the places to be searched and the items sought by the warrant lacks merit. An affidavit need only enable the Magistrate to conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit. The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items and the normal inferences where a criminal would likely hide the evidence. *United States v. Jacobs*, 715 F.2d 1343, 1346 (9th Cir.1983).

I find that such nexus has been established in that there was a reasonable linkage between the crimes for which the defendants were sought and the places to be searched and the items to be seized.

■ Finally, the defendants' contention that the coded notebooks which were seized are immune from search and seizure under the Fourth Amendment is devoid of merit. The distinction once made between seizure of items of evidential value only and seizure of instrumentalities, fruits or contraband was rejected in *Warden v. Hayden*,

387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). "Nothing in the language of the Fourth Amendment supports the distinction between 'mere evidence' and instrumentalities, fruits of crime, or contraband.... Privacy is disturbed no more by a search directed to a purely evidentiary object than it is by a search directed to instrumentality, fruit, or contraband.... Moreover, nothing in the nature of property seized as evidence renders it more private than property seized, for example, as an instrumentality; quite the opposite may be true. Indeed, the distinction is wholly irrational, since, depending on the circumstances, the same 'papers and effects' may be 'mere evidence' in one case and 'instrumentality' in another." 387 U.S. at 301–302, 87 S.Ct. at 1647. The Court concluded by saying that "The Fourth Amendment allows intrusions upon privacy ... and there is no viable reason to distinguish intrusions to secure 'mere evidence' from intrusions to secure fruits, instrumentalities or contraband." 387 U.S. at 310, 87 S.Ct. at 1651. *See also Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) (the search of an individual's office for business records, their seizure, and subsequent introduction into evidence do not offend the Fifth Amendment); *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) (the Court upheld, against Fourth and Fifth Amendment claims, the introduction into evidence of false identity papers and coded messages seized during a search of the accused's hotel room). Although the papers seized in *Andresen* were business records, there is little reason to doubt that the Court's Fifth Amendment analysis in that case would dictate the same result were the papers seized diaries. *See* Note, Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments, 90 Harv. L. Rev. 945, 978 (1977).

For the reasons advanced, the defendants' motion is denied in its entirety.

SO ORDERED.