COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Benton, Coleman, Elder,
          Bray, Bumgardner, Humphreys and Senior Judge Cole
Argued at Richmond, Virginia


GREGORY ALLEN MOYER
                                              OPINION BY
v.    Record No. 2959-97-2         JUDGE LARRY G. ELDER
                                         JULY 25, 2000
COMMONWEALTH OF VIRGINIA


                  UPON A REHEARING EN BANC

         FROM THE CIRCUIT COURT OF FLUVANNA COUNTY
                   John R. Cullen, Judge

         W. Reilly Marchant (Thorsen, Marchant & Scher
         L.L.P., on brief), for appellant.

         Donald E. Jeffrey, III, Assistant Attorney
         General (Mark L. Earley, Attorney General, on
         briefs), for appellee.


     Gregory A. Moyer (appellant) was convicted in a bench trial

on fourteen counts of taking indecent liberties with a minor

pursuant to Code § 18.2-370.1.  On appeal, he contends the trial

court erroneously ruled that (1) police seizure of his personal

journals pursuant to a search warrant and the admission of the

journals into evidence did not violate his Fourth or Fifth

Amendments rights; (2) buttocks are "sexual parts" within the

meaning of Code § 18.2-370.1; and (3) the evidence was

sufficient to support his convictions.  A panel of this Court,

with one judge dissenting, agreed that seizure and admission of

the diaries violated appellant's Fourth and Fifth Amendment

rights, reversed his convictions, and remanded for retrial. See Moyer v. Commonwealth, 30 Va. App. 744, 520 S.E.2d 371 (1999). We granted the Commonwealth's petition for rehearing en banc and stayed the mandate of that decision. Upon rehearing en banc, we hold the trial court did not err in ruling that (1) police seizure of appellant's personal journals pursuant to a search warrant and the admission of the journals into evidence did not violate his Fifth Amendments rights and any Fourth Amendment violation was subject to the good faith exception to the exclusionary rule; (2) buttocks are "sexual parts" within the meaning of Code § 18.2-370.1; and (3) the evidence was sufficient to support his convictions. Therefore, we affirm the decision of the trial court.

## I.

### BACKGROUND

Appellant was an eighth grade science teacher at Fork Union Military Academy (the Academy) in Fluvanna County. He resided in an apartment located in the middle school student barracks and served as a barracks supervisor. In 1997, Academy officials advised local and state police that appellant may have abused one or more of the Academy's students. One official told police that he had entered appellant's apartment to check a water leak. On two different occasions, he observed in appellant's apartment nude photographs depicting two named cadets, J.L. and H.L. Some of the photographs had been taken in appellant's apartment. He

observed several journals containing "information about 'boys needing discipline and spanking.'" He also saw a "delinquency report completed on . . . 11th grader, [J.L.] with the consequences listed as '3 whacks on the bare behind'" and had information that J.L. had been seen leaving appellant's barracks at 10:00 p.m. in violation of school rules. The Academy had a written corporal punishment policy which provided that only the middle school commandant or headmaster could paddle middle school students. The policy also provided that such paddling could occur only while a student was fully clothed and required the parents' written permission. The Academy official opined that, because appellant taught middle school, appellant's relationship with 11th grader J.L. was "strange," and he opined that appellant's contact with an 8th grade student, which involved his constantly escorting the student to off-campus activities, exceeded the "normal student/teacher relationship" and was "unhealthy."

Using this information, police obtained a warrant to search appellant's barracks apartment. The warrant specifically listed as subject to seizure, inter alia, "photographs . . . depicting nudity and/or sexual activities involving children," "[w]ritten materials (letters, diaries) . . . related to sexual conduct between juveniles and adults," and "books . . . and photographs depicting nudity and/or sexual activities of juveniles." While executing the warrant, Deputy Hogsten scanned appellant's

numerous handwritten journals looking for photographs and other materials specified in the warrant.  If Hogsten observed an "explicit" photograph in a journal, he marked the journal and handed it to Trooper Watson, who assisted with the search.  If no explicit photograph was immediately apparent in a journal, Hogsten scanned it "[to] see if [he] could find anything that was in the warrant [they] were looking for."  After reviewing all appellant's journals in this fashion, Hogsten and Watson seized fourteen volumes and left behind two or three. Subsequently, Deputy Craig reviewed the seized journals in greater detail and decided which portions would be used as evidence.

A grand jury indicted appellant on sixteen counts of taking indecent liberties with two minors, J.L. and H.L.  Appellant moved to suppress the excerpts taken from his diaries, arguing that the seizure of the diaries violated the Fourth Amendment's prohibition against general warrants.  He also argued that admission of the excerpts into evidence would violate his Fourth and Fifth Amendment privilege against self-incrimination.  The trial court denied the motion.  It held that the seizure of the diaries did not violate the Fourth Amendment but that, even if it had, the officers executing the warrant acted in good faith. The court also held that admission of excerpts of the diaries into evidence did not violate appellant's privilege against

self-incrimination. At the conclusion of a trial on the merits, the court convicted appellant of fourteen of the sixteen counts.

## II.

## ANALYSIS

Appellant relies on the decision in Boyd v. United States, 116 U.S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1886), for the proposition that seizure of his private journals pursuant to a search warrant violated his privilege against compelled self-incrimination. However, Boyd involved a court order directing partners to produce a business invoice for a glass shipment alleged to have been received without payment of the required import duty. See id. at 617-18, 6 S. Ct. at 525-26; Fisher v. United States, 425 U.S. 391, 406-07, 96 S. Ct. 1569, 1578-79, 48 L. Ed. 2d 39 (1976). It did not involve a search warrant. Although Boyd purported to equate the two, see 116 U.S. at 622, 6 S. Ct. at 527-28, the United States Supreme Court's decisions in Fisher, 425 U.S. 391, 96 S. Ct. 1569, and Andresen v. Maryland, 427 U.S. 463, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976), indicate that they may not be equated. The elements of compulsion and potential self-incrimination that result from the production of documents pursuant to a subpoena do not exist when the police, without assistance from the accused, take existing, voluntarily created documents pursuant to a valid warrant. Therefore, the seizure of appellant's diaries and

their admission into evidence did not violate the Fifth Amendment.

Further, assuming without deciding that the search warrant was insufficiently particularized to permit review of the diaries in their entirety, the evidence supported the trial court's finding that the good faith exception to the exclusionary rule applied. Therefore, a violation of the Fourth Amendment, if one occurred, did not require suppression of the diaries.

Finally, the evidence was sufficient to support the trial court's finding that appellant acted with lascivious intent as to all fourteen convictions and that appellant's behavior in all fourteen instances fell within the proscriptions of the statute.

A.

MOTION TO SUPPRESS UNDER THE FOURTH AND FIFTH AMENDMENTS

At a hearing on a defendant's motion to suppress, the Commonwealth has the burden of proving that the challenged action did not violate the defendant's constitutional rights. See Simmons v. Commonwealth, 238 Va. 200, 204, 380 S.E.2d 656, 659 (1989). On appeal, we view the evidence in the light most favorable to the prevailing party, here the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. See Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). "[W]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or

without evidence to support them[,] and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers."  McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc) (citing Ornelas v. United States, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663, 134 L. Ed. 2d 911 (1996)).  However, we review de novo the trial court's application of defined legal standards such as probable cause and reasonable suspicion to the particular facts of the case.  See Ornelas, 517 U.S. at 699, 116 S. Ct. at 1663.

In the 1886 case of Boyd, 116 U.S. 616, 6 S. Ct. 524, the United States Supreme Court held unconstitutional, under both the Fourth and Fifth Amendments, a subpoena duces tecum ordering Boyd and his partner to produce a partnership invoice which established their guilt for failing to pay an import duty.  See Fisher, 425 U.S. at 405, 96 S. Ct. at 1578.  The Court noted the "intimate relationship between the [Fourth and Fifth] [A]mendments" and, although the records at issue related to the partnership's business transactions, said it was "unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself."  Boyd, 116 U.S. at 633, 6 S. Ct. at 534.  As a result, it held that

> a compulsory production of private books and
> papers of the owner of goods sought to be
> forfeited in such a suit is compelling him
> to be a witness against himself, within the
> meaning of the Fifth Amendment to the

> Constitution, and is the equivalent of a
> search and seizure--and an unreasonable
> search and seizure--within the meaning of
> the Fourth Amendment.

Id. at 634-35, 6 S. Ct. at 534-35; see id. at 622, 6 S. Ct. at 527-28.

The Court noted in Boyd that the government was authorized to "seize a person's documents or other property as evidence [if] it [could] claim a proprietary interest in the property superior to that of the person from whom the property [was] obtained." Fisher, 425 U.S. at 406, 96 S. Ct. at 1578 (citing Boyd, 116 U.S. at 623-24, 6 S. Ct. at 528-29). Also, it was entitled to search for and seize "excisable articles" over which officers of the revenue had authority and "entries thereof in books required by law to be kept for their inspection." Boyd, 116 U.S. at 623-24, 6 S. Ct. at 528-29.

Appellant argues that the Court's basic holding in Boyd, as applied to private papers that are testimonial or communicative and that are in the possession of the accused, has never been reversed. Significantly, however, the records at issue in Boyd were business documents, and "therefore its declarations regarding the [Fourth and Fifth] Amendment[s'] protection of non-business documents were dicta." United States v. Doe, 1 F.3d 87, 92 (2d Cir. 1993).

Even if Boyd's application to non-business papers is not considered dicta, subsequent Supreme Court decisions delineate

clear limits on Boyd which render it inapplicable in this case.

In the more recent case of Fisher, which involved a subpoena for

tax documents prepared by an individual's accountant and

transferred by him to his lawyer, the Court made the following

statement about Boyd:

> Among its several pronouncements, Boyd was
> understood to declare that the seizure,
> under warrant or otherwise, of any purely
> evidentiary materials violated the Fourth
> Amendment and that the Fifth Amendment
> rendered these seized materials
> inadmissible. . . .  Private papers taken
> from the taxpayer, like other "mere
> evidence," could not be used against the
> accused over his Fourth and Fifth Amendment
> objections.

Fisher, 425 U.S. at 407, 96 S. Ct. at 1579.  The Court also

noted, however, that

> [s]everal of Boyd's express or implicit
> declarations have not stood the test of
> time.  The application of the Fourth
> Amendment to subpoenas was limited by Hale
> v. Henkel, 201 U.S. 43[, 26 S. Ct. 370, 50
> L. Ed. 652] (1906), and more recent cases.
> Purely evidentiary (but "nontestimonial")
> materials, as well as contraband and fruits
> and instrumentalities of crime, may now be
> searched for and seized under proper
> circumstances, Warden v. Hayden, 387 U.S.
> 294[, 87 S. Ct. 1642, 18 L. Ed. 2d 782]
> (1967).  Also, any notion that "testimonial"
> evidence may never be seized and used in
> evidence is inconsistent with [Katz v.
> United States, 389 U.S. 347, 88 S. Ct. 507,
> 19 L. Ed. 2d 576 (1976), and other cases],
> approving the seizure under appropriate
> circumstances of conversations of a person
> suspected of crime.

Id. at 407-08, 96 S. Ct. at 1579 (citations and footnote omitted); see Code § 19.2-53 (permitting seizure, pursuant to search warrant, of "[a]ny object, thing, or person, including without limitation, documents, books, papers, records, or body fluids, constituting evidence of the commission of crime").

The Court also significantly limited the meaning of compulsion under the Fifth Amendment, holding that where "the preparation of all the papers sought [by subpoena] . . . was wholly voluntary, . . . they cannot be said to contain compelled testimonial evidence." Id. at 409-10, 96 S. Ct. at 1580 (emphasis added); see Andresen, 427 U.S. at 473, 96 S. Ct. at 2745; see also Couch v. United States, 409 U.S. 322, 329, 93 S. Ct. 611, 616, 34 L. Ed. 2d 548 (1973) (in case involving subpoena to accountant for tax records of accused, stating that "divulgence of . . . possibly incriminating information, . . . where it does not result from coercion of the suspect herself, is a necessary part of the process of law enforcement and tax investigation").

> The proposition that the Fifth
> Amendment protects private information
> obtained without compelling
> self-incriminating testimony is contrary to
> the clear statements of this Court that
> under appropriate safeguards private
> incriminating statements of an accused may
> be overheard and used in evidence, if they
> are not compelled at the time they were
> uttered . . . . If the Fifth Amendment
> protected generally against the obtaining of
> private information from a man's mouth or
> pen or house, its protections would

presumably not be lifted by probable cause
and a warrant or by immunity.  The privacy
invasion is not mitigated by immunity; and
the Fifth Amendment's strictures, unlike the
Fourth's, are not removed by showing
reasonableness.  The Framers addressed the
subject of personal privacy directly in the
Fourth Amendment.  They struck a balance so
that when the State's reason to believe
incriminating evidence will be found becomes
sufficiently great, the invasion of privacy
becomes justified and a warrant to search
and seize will issue.  They did not seek in
still another Amendment--the Fifth--to
achieve a general protection of privacy but
to deal with the more specific issue of
compelled self-incrimination.

We cannot cut the Fifth Amendment
completely loose from the moorings of
its language, and make it serve as a general
protector of privacy--a word not mentioned
in its text and a concept directly addressed
in the Fourth Amendment.  We adhere to the
view that the Fifth Amendment protects
against "compelled self-incrimination, not
[the disclosure of] private information."

Fisher, 425 U.S. at 400-01, 96 S. Ct. at 1575-76 (citations

omitted).  Therefore, "[i]n the case of a documentary subpoena

the only thing compelled is the act of producing the document[1]

and the compelled act is the same as the one performed when a

---

[1] The Court noted that "[c]ompliance with the subpoena
tacitly concedes the existence of the papers demanded and their
possession or control by the [person producing them].  It would
also indicate the [producer's] belief that the papers are those
described in the subpoena."  Fisher, 425 U.S. at 410, 96 S. Ct.
at 1581.  It reasoned that "[t]he elements of compulsion are
clearly present, but that the more difficult issues are whether
the tacit averments of the [producer] are both 'testimonial' and
'incriminating' for purposes of applying the Fifth Amendment.'"
Id.  It concluded that the resolution of these "more difficult
issues" likely "depend[ed] on the facts and circumstances of
particular cases or classes thereof."  Id.

chattel or document not authored by the producer is demanded."
Id. at 410 n.11, 96 S. Ct. at 1580 n.11 (footnote added); see
also United States v. Doe, 465 U.S. 605, 610-12, 104 S. Ct.
1237, 1241-42, 79 L. Ed. 2d 552 (1984) (extending Fisher to hold
that Fifth Amendment does not protect contents of an
individual's tax records in his possession).  Although Fisher
dealt with a subpoena for business records, its statements
regarding compulsion to prepare or create the documents do not
distinguish between business records and private or personal
records, and we discern no legitimate basis for making such a
distinction.  Either the preparation of a document was compelled
or it was not, regardless of its classification as business or
private.  See Wayne R. LaFave, Search and Seizure § 2.6(e), at
611 (3d ed. 1996).  As a result, appellant's diaries, which were
prepared voluntarily, are not protected by the Fifth Amendment
privilege against self-incrimination unless appellant was
compelled to produce them, and then, only the act of production
and not the contents of the diaries would be protected.

Further, the Court has held that the compulsion which
results when an accused is required to produce documentary
evidence pursuant to a subpoena does not exist when law
enforcement personnel instead seize the evidence pursuant to a
valid search warrant.  See Andresen, 427 U.S. at 473-74, 96
S. Ct. at 2745; see also 1 LaFave, supra, at 612.  The Court
noted in Andresen that

> although the Fifth Amendment may protect an
> individual from complying with a subpoena
> for the production of his personal records
> in his possession because the very act of
> production may constitute a compulsory
> authentication of incriminating information,
> see Fisher v. United States, supra, a
> seizure of the same materials by law
> enforcement officers differs in a crucial
> respect--the individual against whom the
> search is directed is not required to aid in
> the discovery, production, or authentication
> of incriminating evidence.[2]

Andresen, 427 U.S. at 473-74, 96 S. Ct. at 2745 (footnote

added); see also id. at 470 n.5, 96 S. Ct. at 2743 n.5 (noting

conflict in federal courts of appeals on issue of whether

documentary evidence not obtainable by subpoena may nevertheless

be obtainable pursuant to a search warrant and indicating that

substantial majority of circuits, along with Professor Wigmore,

hold that it may).  Therefore, "[t]he risk of authentication is

not present where the documents are seized pursuant to a search

warrant."[3]  Id. at 473 n.7, 96 S. Ct. at 2745 n.7; see id. at

473, 96 S. Ct. at 2745 (noting that this approach is in keeping

with the principle that "'[a] party is privileged from producing

---

[2] Although Andresen, like Fisher, involved business records, the Court in Andresen specifically discussed personal records and the difference between their subpoena and seizure.

[3] Here, appellant's diaries were authenticated by J.L., who testified that appellant kept a journal, which appellant tried to write in on a daily basis.  J.L. testified to his familiarity with appellant's handwriting, identified appellant's handwriting in the diaries, and indicated that he also had written in appellant's journals.  On appeal, appellant does not directly challenge the authentication of the diaries.

the evidence but not from its production'" (quoting <u>Johnson v.</u>

<u>United States</u>, 228 U.S. 457, 458, 33 S. Ct. 572, 572, 57 L. Ed.

919 (1913)).

> Insofar as private information not obtained through compelled self-incriminating testimony is legally protected, its protection stems from other sources--the Fourth Amendment's protection against seizures without warrant or probable cause and against subpoenas which suffer from "too much indefiniteness or breadth in the things required to be 'particularly described,'" or evidentiary privileges such as the attorney-client privilege.

<u>Fisher</u>, 425 U.S. at 401, 96 S. Ct. at 1576 (citations and

footnote omitted); <u>see</u> <u>also</u> <u>id.</u> at 401 n.6, 96 S. Ct. at 1576

n.6 (citing <u>Couch</u>, 409 U.S. 322, 93 S. Ct. 611, 34 L. Ed. 2d

548, which involved a subpoena to an accountant for tax records

of the accused and in which the Court "differentiated between

the things protected by the Fourth and Fifth Amendments," and

noting that "'there exist[ed] no legitimate expectation of

privacy [the Fourth Amendment claim] and no semblance of

governmental compulsion against the person of the accused [the

Fifth Amendment claim]'").

For these reasons, neither the seizure nor admission into

evidence of appellant's diaries violated his Fifth Amendment

privilege against compelled self-incrimination.  This conclusion

does not, however, resolve the issue of whether the seizure of

appellant's diaries was reasonable under the Fourth Amendment.

The Court in Fisher noted that

> [t]he taxpayers and their attorneys have not raised arguments of a Fourth Amendment nature before this Court and could not be successful if they had.  The summonses are narrowly drawn and seek only documents of unquestionable relevance to the tax investigation.  Special problems of privacy which might be presented by subpoena of a personal diary are not involved here.

Id. at 401 n.7, 96 S. Ct. at 1576 n.7 (emphasis added).  Thus, the Court made clear that constitutional privacy issues, if any, associated with subpoenaing one's personal diary would involve Fourth Amendment rather than Fifth Amendment protections.[4]

Appellant contends the seizure of his diaries was unreasonable under the Fourth Amendment and violated that amendment's particularity requirement.  For the reasons that follow, we hold that the trial court's denial of appellant's suppression motion also did not violate the Fourth Amendment.

The Fourth Amendment, designed to protect against unreasonable searches and seizures, provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const.

---

[4] It also noted its earlier "reserv[ation of] the question 'whether there are items of evidential value whose very nature precludes them from being the object of a reasonable search and seizure.'"  Fisher, 425 U.S. at 407 n.9, 96 S. Ct. at 1579 n.9 (quoting Hayden, 387 U.S. at 302-03, 87 S. Ct. at 1648).

amend. IV.  Similar mandates exist in Virginia's Constitution and statutes.  See Va. Const. art. I, § 10; Code § 19.2-54 ("no general warrant for the search of a house, place, compartment, vehicle or baggage shall be issued").  The "distinct objective [of the warrant requirement] is that those searches deemed necessary should be as limited as possible"; it is intended to prevent "a general, exploratory rummaging in a person's belongings."  Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S. Ct. 2022, 2038, 29 L. Ed. 2d 564 (1971).

> So long as the "search warrant describe[s] the objects of the search with reasonable specificity," it complies with the dictates of the [F]ourth [A]mendment.  The determination whether the warrant possesses the requisite degree of specificity necessarily requires a fact-specific, case-specific analysis.  However, search warrants that limit the executing officers' discretion by directing them to seize only evidence of a specific crime consistently have been held to satisfy the particularity requirement of the [F]ourth [A]mendment.

Morke v. Commonwealth, 14 Va. App. 496, 500-01, 419 S.E.2d 410, 413 (1992) (citation omitted).

The exclusionary rule is a judicial creation which, under certain circumstances, prevents evidence obtained in violation of one's Fourth Amendment rights from being admitted into evidence against him in a criminal prosecution.  See Commonwealth v. Ealy, 12 Va. App. 744, 750, 407 S.E.2d 681, 685 (1991).

In [United States v. Leon, 468 U.S. 897, 104
S. Ct. 3405, 82 L. Ed. 2d 677 (1984)], the
United States Supreme Court held that
"suppression of evidence obtained pursuant
to a warrant should be ordered only on a
case-by-case basis and only in those unusual
cases in which exclusion will further the
purposes of the exclusionary rule."  The
Supreme Court also stated that "the
exclusionary rule is designed to deter
police misconduct. . . ."  This deterrent is
not present when a police officer, acting in
objective good faith, obtains a search
warrant from a magistrate and conducts a
search within the scope of the warrant.  We
have embraced and applied the good faith
exception to the exclusionary rule.

Polston v. Commonwealth, 255 Va. 500, 503, 498 S.E.2d 924,

925-26 (1998) (quoting Leon, 468 U.S. at 916, 918, 104 S. Ct. at

3417, 3418) (other citations omitted).

    In keeping with the goal of deterring police misconduct,

"[s]uppression . . . remains an appropriate
remedy if the magistrate or judge in issuing
a warrant was misled by information in an
affidavit that the affiant knew was false or
would have known was false except for his
reckless disregard of the truth. . . .  The
exception . . . will also not apply in cases
where the issuing magistrate wholly
abandoned his judicial role. . . .  [I]n
such circumstances, no reasonably well
trained officer should rely on the warrant.
Nor would an officer manifest objective good
faith in relying on a warrant based on an
affidavit 'so lacking in indicia of probable
cause as to render official belief in its
existence entirely unreasonable'. . . .
Finally, depending on the circumstances of
the particular case, a warrant may be so
facially deficient--i.e., in failing to
particularize the place to be searched or
the things to be seized--that the executing
officers cannot reasonably presume it to be
valid."

Id. at 503, 498 S.E.2d at 926 (quoting Leon, 468 U.S. at 923,

104 S. Ct. at 3421 (citations omitted)).

Regardless of the validity of the search warrant, the

diaries seized from appellant's apartment were admissible in

their entirety under the good faith exception.[5]  The warrant

_____

[5] Settled legal principles provide that "[a] lawful search of premises described in a warrant 'extends to the entire area in which the object[s] of the search may be found.'"  Kearney v. Commonwealth, 4 Va. App. 202, 205, 355 S.E.2d 897, 899 (1987) (quoting United States v. Ross, 456 U.S. 798, 820, 102 S. Ct. 2157, 2170, 72 L. Ed. 2d 572 (1982)).  "'[A] search may be as extensive as reasonably required to locate the items described in the warrant.'"  Id. (citation omitted).  "A warrant to search a [premises] would support a search of every part of the [premises] that might contain the object of the search."  Ross, 456 U.S. at 821, 102 S. Ct. at 2171.  While the police are lawfully engaged in such a search, the plain view doctrine applies, and they may seize any item if it is "immediately apparent" that the item may be evidence of a crime, contraband, or otherwise subject to seizure.  Coolidge, 403 U.S. at 466, 91 S. Ct. at 2038; see Ruffin v. Commonwealth, 13 Va. App. 206, 208-09, 409 S.E.2d 177, 178-79 (1991).
    At a minimum, the warrant was specific enough to permit the police to conduct a detailed search of appellant's apartment for "[p]hotographs, movies[,] videotapes, negatives, slides, and/or undeveloped film depicting nudity and/or sexual activities involving children . . . that would tend to identify (victims and offenders)."  The Academy official whose observations were used to support the warrant stated that, on two separate occasions, he had observed in appellant's Academy apartment nude photographs of two named Academy students.  The warrant authorized a search for certain photographs, and the police were authorized to search any area of the apartment in which the photographs might reasonably be found.  See Ross, 456 U.S. at 821, 102 S. Ct. at 2171.  Because the photographs were items which could have been--and, in fact, were--in appellant's diaries, the police acted reasonably in leafing through the diaries in search of photographs like those described in the warrant.  Further, while leafing through the diaries, they were permitted to seize any other items to which the plain view doctrine applied.  For example, if the police had found illegal drugs between the pages of the diary, the seizure and

specifically listed as subject to seizure, inter alia,

"[p]hotographs . . . depicting nudity and/or sexual activities

involving children," "[w]ritten materials (letters, diaries)

. . . related to sexual conduct between juveniles and adults,"

and "books . . . and photographs depicting nudity and/or sexual

activities of juveniles." The trial court specifically found

that the police officers executing the warrant and reviewing the

evidence for trial acted in good faith, and we discern no

evidence in the record which contradicts the trial court's

finding.

Appellant does not allege and no evidence supports a

finding that the magistrate was misled by false information in

the affidavit. In addition, neither the warrant nor the

affidavit was so deficient that no reasonably trained officer

should rely on it. The affidavit accompanying the warrant

recited the statements of the Academy official in charge of the

middle school that he twice had observed in appellant's

apartment nude photos of two students, some of which had been

taken in appellant's barracks apartment. On one of these

occasions, the Academy official observed several journals

containing "information about 'boys needing discipline and

---

introduction of the drugs into evidence would not violate the
Fourth Amendment. This same principle would apply to any
written passage of the diary if it became "immediately apparent"
that a particular passage likely was evidence of a crime or was
otherwise subject to seizure.

spanking.[']"  He also saw a "delinquency report completed on
. . . 11th grader, [J.L.], with the consequences listed as '3
whacks on the bare behind'" and had information that J.L. had
been seen leaving appellant's barracks at 10:00 p.m. in
violation of school rules.  Finally, the Academy official opined
that, because appellant taught middle school, appellant's
relationship with 11th grader J.L. was "strange" and that
appellant's contact with an 8th grade student, which involved
his constantly escorting the student to off-campus activities,
exceeded the "normal student/teacher relationship" and was
"unhealthy."

Assuming without deciding that this information was
insufficient to permit a line-by-line search of appellant's
diaries, it was not so deficient that the magistrate or
executing officers should have known it was invalid.  See Janis
v. Commonwealth, 22 Va. App. 646, 654, 472 S.E.2d 649, 653
(holding that determining objective reasonableness of belief in
probable cause must be based "solely on the affidavit"), aff'd
on reh'g en banc, 24 Va. App. 207, 481 S.E.2d 473 (1996).  As
discussed above, existing case law does not make clear whether
or under what circumstances the Fourth Amendment permits the
seizure and introduction into evidence of personal diaries.  As
a result, the good faith exception to the exclusionary rule
rendered proper the admission into evidence of the challenged

portions of appellant's diaries.  Therefore, we affirm the trial court's denial of appellant's motion to suppress.

B.

SUFFICIENCY OF THE EVIDENCE TO PROVE LASCIVIOUS INTENT

Code § 18.2-370.1 provides as follows:

> Any person eighteen years of age or older who maintains a custodial or supervisory relationship over a child under the age of eighteen, . . . and who, with lascivious intent, knowingly and intentionally . . . (iii) exposes his or her sexual or genital parts to such child, or (iv) proposes that any such child expose his or her sexual or genital parts to such person, . . . shall be guilty of a Class 6 felony.

Appellant was convicted of violating the quoted portion of the statute on fourteen separate occasions, eleven of which involved J.L. (Indictments 97F46 and 97F48 to 97F57) and three of which involved H.L. (Indictments 97F59, 97F62 and 97F63).

Appellant contends that the testimony of J.L. that appellant was sexually aroused during some of their encounters is inherently incredible and that, without this testimony, the evidence is insufficient to prove lascivious intent as to the eleven convictions involving J.L.  Appellant also contends that because H.L., in testifying for the Commonwealth, denied that appellant showed any signs of sexual arousal during their contact, the Commonwealth's evidence also is insufficient to prove that appellant acted with the requisite lascivious intent

as to the three convictions involving H.L.  We hold that sufficient evidence of intent supports all fourteen convictions.

Under familiar principles of appellate review, we must examine the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.  See Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987).  In assessing witness credibility, the fact finder may accept the parts of a witness' testimony it finds believable and reject other parts as implausible.  See Pugliese v. Commonwealth, 16 Va. App. 82, 92, 428 S.E.2d 16, 24 (1993).  The conclusions of the fact finder on issues of witness credibility "may only be disturbed on appeal if this Court finds that [the witness'] . . . testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'"  Robertson v. Commonwealth, 12 Va. App. 854, 858, 406 S.E.2d 417, 419 (1991) (quoting Fisher v. Commonwealth, 228 Va. 296, 299-300, 321 S.E.2d 202, 204 (1984)).  These same principles apply to the testimony of both expert and lay witnesses.  See Street v. Street, 25 Va. App. 380, 387-89, 488 S.E.2d 665, 668-69 (1997) (en banc).

The mental state required to support appellant's convictions is one of lasciviousness.  See Code § 18.2-370.1. "[T]he word 'lascivious' describes a state of mind that is eager for sexual indulgence, desirous of inciting to lust or of inciting sexual desire and appetite."  McKeon v. Commonwealth,

211 Va. 24, 27, 175 S.E.2d 282, 284 (1970).  The Supreme Court has recognized that circumstantial evidence of lasciviousness may include "evidence that the defendant was sexually aroused; that he made . . . gestures toward himself or to [the victim]; that he made . . . improper remarks to [the victim]; or that he asked [the victim] to do anything wrong."  Id.  "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt."  Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983).

Here, the direct and circumstantial evidence supported the trial court's finding that appellant acted with lascivious intent and excluded all reasonable hypotheses of innocence.  The evidence, viewed in the light most favorable to the Commonwealth, established that appellant began relationships with the two victims when they were students in his eighth grade science class and that he engaged in illegal behavior with them, separately, on at least fourteen different occasions over the course of two years.

The Academy had a written corporal punishment policy which provided that only the middle school commandant or headmaster could paddle middle school students.  The policy also provided that such paddling could occur only while a student was fully clothed and required the parents' written permission.

Despite this policy, after appellant and J.L. became close friends, appellant suggested to J.L. that he would not turn J.L.'s demerits over to the commandant if J.L. would agree to allow appellant to paddle J.L. on the buttocks as an alternate form of punishment. Appellant initially paddled J.L. while J.L. was clothed, but in early February 1994, appellant told J.L. he would administer the "whacks" on "the bare ass." Appellant paddled J.L.'s bare buttocks and documented the paddling in his diary. Shortly thereafter, appellant proposed that J.L. paddle appellant on appellant's bare buttocks. J.L. did so, and appellant again documented the incident in his diary.

Similar events occurred on or about March 3, March 4, and March 10, 1994, with appellant documenting the paddlings in his diary on each occasion. On each of these occasions, the person being paddled was partially or totally nude, and the two followed a ritual requiring the person being paddled to turn after each paddling to face and salute the person administering the paddling. Appellant's diary entries for these days indicate a preoccupation with the fact that the paddling rendered his or J.L.'s "ass" "bare" and "sore," and he described "a large red welt" that developed on J.L.'s buttocks and the "pain . . . in [J.L.'s] face" while appellant administered the paddling. Appellant also wrote that he was "psyched" to "bare his [own] ass to the wrath of [J.L.]" and told J.L. that one of his

paddlings "barely hurt" and that J.L. had "better make it worthwhile."

Sometime thereafter, at appellant's suggestion, appellant and J.L. formed a secret society, and appellant obtained for his car personalized license plates that bore the society's acronym. They designed a series of initiation events, all involving nudity, and appellant documented the preparation and actual events with photographs and detailed diary entries. J.L. testified that, during the nude tree-climbing event, appellant asked J.L. to shine the flashlight on appellant, and J.L. noticed that appellant "was half aroused." During another event, appellant tied J.L. up and used his hands to cover J.L.'s entire body, including his genitals, with shaving cream. When it was J.L.'s turn to tie appellant up and coat him in shaving cream, J.L. used a newspaper to spread the shaving cream on appellant's genitals because he did not want to touch them, and he noticed that appellant had an erection at that time. Appellant subsequently wrote of their being "brothers" who will "share without asking and tak[e] without first giving. We will be like one." When appellant reflected on that night about two years later by rereading his journal, he noted that the "night was fantastic and one that I will never forget."

On at least six occasions during J.L.'s ninth grade year, appellant and J.L. engaged in additional acts of nude buttocks paddling, nude wrestling and the like. On two occasions in

November 1994, appellant paddled J.L. on "his bare ass,"
purportedly to discipline him for smoking.  On the latter
November date, appellant wrote that he "had to fight [J.L.] for
it" and "ma[de] sure to hit different spots so no part of
[J.L.'s] ass was left unred."  On January 26, 1995, appellant
observed that J.L. "made sure [appellant's] birthday did not go
by unrewarded," by paddling appellant over thirty times on
appellant's bare buttocks.  On February 9, 1995, when appellant
was in a bad mood, J.L. repeated the "shaving cream and fan"
torture.  Appellant wrote that "[his] ass was red and sore from
the beatings" but that "hanging there naked and suffering the
epitomy [sic] of pain livened up [his] day."  On February 13,
1995, appellant inflicted the same "torture" on J.L., and the
two ended the events with a "bout" of nude wrestling.  On
February 14, 1995, J.L. returned to appellant's apartment "with
vengeance on his mind."  Appellant wrote that appellant was
"naked and tied up" and received "a severe beating."

     During late 1995 and early 1996, appellant documented three
encounters with a former student named H.L.  H.L. visited
appellant in North Dakota, where appellant was working for the
summer.  At some point during H.L.'s visit, the two briefly
discussed the secret society appellant had formed with J.L.
They also "hiked naked to the top of a butte."

     Although H.L. did not return to the Academy as a student in
the fall of 1995, he and appellant remained in contact by letter

and phone and saw each other several times during the fall.  In December 1995, H.L. visited appellant at the Academy to celebrate H.L.'s birthday.  On December 16, appellant wrote that H.L. was still asleep in appellant's apartment and that he knew H.L. was "anxious for everyone to leave [the Academy] so he could spend some quality time alone with [appellant]."  During H.L.'s visit, they played poker and wagered whacks with the paddle rather than money.  Then they each stood nude in front of appellant's dresser and paddled each other until their "asses" were "red" and "sore."  The next morning, they showered and repeated the paddling process "until all debts were paid."

H.L. visited appellant again in late February 1996 for appellant's birthday.  Appellant said that "[o]ne of the main reasons [H.L.] came was to give [appellant] his birthday card but not before he paddled [appellant's] bare ass."  On the night of February 24, appellant showered and stood nude in front of his dresser to receive his first ten paddlings.  Appellant and H.L. then watched a movie, after which H.L. administered the second ten paddlings.  Appellant wrote that the second ten "really hurt so [he] just stayed naked the rest of the night to cool off [his] ass."  The next morning, February 25, appellant woke H.L. so that H.L. could administer the last ten whacks, which left "[appellant's] ass aflame with pain."  Appellant then administered one whack to H.L. "to keep him honest until we see each other again."  H.L. showered, stood naked in front of

appellant's dresser, and "[appellant] whacked his ass much harder than usually."  Appellant wrote of the weekend,

> [H.L.] paddled my bare ass and beat me in wrestling but we had a great time together. I miss him already.  Whether it be his playing the guitar or late night personal conversations, he is a pleasure to have around.  I am already looking forward to the next weekend. . . .  It is always great to have [him] spend the weekend and I cannot wait until the next time.

During July 1996, H.L. again visited appellant in North Dakota and went through the shaving cream and other rituals in order to be initiated into the secret society.

In testifying at trial, appellant admitted that the relationships he developed with J.L. and H.L. were "bizarre" and "wrong," although he denied that they involved any sexual purpose or intent.

The evidence supports the trial court's findings that appellant committed these acts with J.L. and H.L. with lascivious intent.  Although appellant challenges J.L.'s testimony as inherently incredible, we cannot conclude his testimony was incredible as a matter of law.  The trial court heard J.L. testify and heard testimony from various other witnesses attacking J.L.'s credibility, but it chose to believe the testimony of J.L. which was corroborated, at least in part, by appellant's journal entries.  Although the evidence of any particular offense, standing alone, might be insufficient to establish that appellant acted with lascivious intent,

appellant's course of conduct in using his position as an adult role model to gain the trust of J.L. and H.L. and establish close personal relationships with them, coupled with detailed diary accounts of appellant's repeated nude paddlings and other encounters with these children and the testimony of J.L. that appellant was sexually aroused during two of J.L.'s encounters with him, is sufficient to support a finding that appellant acted with the requisite lascivious intent in exposing his sexual or genital parts to both boys or proposing that they expose their sexual or genital parts to him.  The trial court determined that this was the only reasonable hypothesis flowing from the evidence, and we hold that it did not err in so finding.

C.

CONSTRUCTION OF CODE § 18.2-370.1

Appellant poses an additional challenge to five of his convictions, under Indictments 97F46, 97F48, and 97F50 to 97F52, all of which involved J.L.  He contends that the evidence proved, at most, that "bare buttocks" were exposed, and he argues, contrary to the trial court's ruling, that "bare buttocks" do not constitute "sexual . . . parts" within the meaning of Code § 18.2-370.1.  Furthermore, he contends the admission of evidence of buttocks paddling "tainted the entire case in that the Trial Court heard and considered this evidence in considering all of the other indictments."

The trial court specifically found that buttocks are not genital parts but are sexual parts within the meaning of the statute. It also held that, in at least some instances, appellant and J.L. faced each other while nude such that the exposure involved genitalia as well as buttocks and, therefore, fell within the statute's proscriptions. For the reasons that follow, we hold that the acts for which appellant was convicted fell within the proscriptions of the statute.

First, in keeping with the trial court's statements, the evidence is sufficient to support two of the five challenged offenses regardless of whether buttocks are sexual parts; as to indictments 97F50 and 97F51, the evidence was sufficient to establish that genitalia also were exposed.

Appellant's demerit sheet and diary entries, both in appellant's handwriting, make clear that the routine followed on March 2, 1994, which was covered in indictment 97F49, was that J.L. "had to strip down totally naked, and after each whack, turn to salute [appellant]." Appellant concedes on appeal, and we agree, that the evidence of the events charged in indictment 97F49 was sufficient to establish that appellant proposed J.L. expose his genitals to appellant on March 2, 1994.

Regarding challenged indictment 97F50, which covered the events of March 4, 1994, the evidence establishes that appellant wrote J.L. a note proposing that J.L. report to appellant's apartment for "3 whacks on [the] bare ass" while nude and that

the routine would be the same as on March 2, 1994. Appellant's diary indicated that J.L., in fact, "received . . . six whacks" while nude and that "[t]he routine was the same" as it had been on March 2, 1994. Therefore, because "[t]he routine was the same" on March 4, 1994, when appellant administered the whacks associated with indictment 97F50, the evidence supports a finding that the routine appellant proposed and administered on March 4, 1994, involved the same genital exposure.

These same facts apply to indictment 97F51, involving the events of March 10, 1994. The evidence supports a finding that, on or about that date, appellant exposed his genitals to J.L. Appellant wrote up a demerit slip for himself, proposing that J.L. administer two whacks to appellant. When J.L. administered the whacks, appellant was nude and had to turn to J.L. and salute him.

Furthermore, under established rules of statutory construction, the term "sexual parts" as used in Code § 18.2-370.1 necessarily includes buttocks. Appellant urges us to construe the term "sexual parts" as used in Code § 18.2-370.1 as being coextensive with "genital parts." However, settled principles of statutory construction prevent such an interpretation.

Ordinarily, when a particular word in a statute is not defined therein, a court must give it its ordinary meaning. See McKeon v. Commonwealth, 211 Va. 24, 27, 175 S.E.2d 282, 284

(1970).  In interpreting a statute, "'[t]he Code of Virginia constitutes a single body of law, and other sections can be looked to where the same phraseology is employed.'"  Hart v. Commonwealth, 18 Va. App. 77, 79, 441 S.E.2d 706, 707 (1994) (quoting King v. Commonwealth, 2 Va. App. 708, 710, 347 S.E.2d 530, 531 (1986)).  Finally, although "penal statutes must be strictly construed against the Commonwealth and applied only in those cases clearly falling within the language of the statute," Branch v. Commonwealth, 14 Va. App. 836, 839, 419 S.E.2d 422, 424 (1992), "'[i]t is the duty of the courts to give effect, if possible, to every word of the written law,'" Burnette v. Commonwealth, 194 Va. 785, 788, 75 S.E.2d 482, 484-85 (1953) (citation omitted); see also 17 Michie's Jurisprudence, Statutes § 42 (1994).

The ordinary dictionary definition of "sexual" is "1. Of, relating to, involving, or characteristic of sex, sexuality, the sexes, or the sex organs and their functions.  2. Implying or symbolizing erotic desires or activity.  3. Of, relating to, or involving the union of male and female gametes:  sexual reproduction."  The American Heritage Dictionary of the English Language 1654 (3d ed. 1992).  "Genital," in relevant part, is defined as "1. Of or relating to biological reproduction [or] 2. . . . [the reproductive organs, especially the external sex organs]."  Id. at 756.  Giving these words their plain meaning, the term "sexual parts" clearly encompasses certain genital

parts, as well.  However, to interpret the term "sexual parts"

as including only genital parts or vice versa would violate

rules of statutory construction.  Instead, as set out above, we

must presume the legislature intended to give separate meaning

to the term "sexual parts" and did not intend merely to use

superfluous language.  See Burnette, 194 Va. at 788-89, 75

S.E.2d at 484-85.

In determining whether that separate meaning includes

buttocks, both the dictionary definition and the definitions of

similar terms in other code sections are instructive.  Under the

second quoted definition of sexual, the term "sexual parts"

would also include those parts which "impl[y] or symboliz[e]

erotic desires or activity."  Such a definition is not limited

to reproductive parts.  Similarly, in Code § 18.2-67.10(2),

which defines terms used in the article proscribing various

types of criminal sexual assault, "intimate parts" include not

only the genitalia but also the "anus, groin, breast or

buttocks."  Further, as the trial court observed in this case,

in Code § 18.2-390, which defines terms used in the article

proscribing the sale or loan of certain items to juveniles,

"sexual conduct" includes certain "actual or . . . simulated

. . . contact in an act of apparent sexual stimulation or

gratification with a person's clothed or unclothed genitals,

pubic area, buttocks or, if such be female, breast."  Neither of

these definitions limits the use of the term "sexual" to the

reproductive organs.  Although the definition of sexual conduct requires more than simulated or actual contact, it makes clear that contact even with non-reproductive parts such as buttocks may nevertheless be sexual if accompanied by the proper intent. Therefore, buttocks are "sexual parts" under Code § 18.2-370.1 if the accused, acting with the requisite lascivious intent, exposes his buttocks to a juvenile or proposes that a juvenile expose the juvenile's buttocks to the accused.  Therefore, because the evidence supports the trial court's finding that appellant acted with lascivious intent, it also supports the finding that the buttocks exposed in each of the challenged cases were "sexual parts" within the meaning of the statute.

## III.

## CONCLUSION

For these reasons, we hold the trial court did not err in ruling that (1) police seizure of appellant's personal journals pursuant to a search warrant and the admission of the journals into evidence did not violate his Fifth Amendments rights, and any Fourth Amendment violation was subject to the good faith exception to the exclusionary rule; (2) buttocks are "sexual parts" within the meaning of Code § 18.2-370.1; and (3) the evidence was sufficient to support his convictions.  Therefore, we affirm appellant's convictions.

<u>Affirmed.</u>

Benton, J., with whom Coleman, J., joins, dissenting.

Because I conclude that Boyd v. United States, 116 U.S. 616 (1886), bars the seizure and use of Moyer's diaries, I would hold that the trial judge's ruling permitting the use of those diaries against Moyer at trial violated Moyer's rights under the Fifth Amendment. Therefore, I respectfully dissent.

In relevant part, the Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  In Boyd, the United States Supreme Court held unconstitutional, under the Fourth and Fifth Amendments, a subpoena duces tecum ordering Boyd to produce an invoice which established his guilt for nonpayment of a duty tax.  The Court explained that it was "unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself."  Id. at 633.  Thus, the Court held "that a compulsory production of the private books and papers of the [accused] . . . is compelling him to be a witness against himself, within the meaning of the Fifth Amendment to the Constitution, and is the equivalent of a search and seizure -- and an unreasonable search and seizure -- within the meaning of the Fourth Amendment."  Id. at 634-35.  Not even a warrant supported by probable cause could mask the "'unreasonable' character of such seizures" and legitimize the use of those seized documents at trial.  Id. at 633.

Following this landmark decision, the Court has refined the scope of Boyd's Fifth Amendment holding. In Couch v. United States, 409 U.S. 322, 324 (1973), the Court decided the "question . . . whether the taxpayer may invoke her Fifth Amendment privilege against compulsory self-incrimination to prevent the production of her business and tax records in the possession of her accountant." The Court held that when an individual surrenders his or her business records to the possession of a third party, and the government subpoenas the third party to produce the records, the individual has no expectation of privacy in the records and the Fifth Amendment does not bar their production. See id. at 329-30. Significantly, the Court noted that Boyd concerned an accused who possessed his own private papers and "did not . . . address or contemplate the divergence of ownership and possession." Id. at 330.

Later, in Fisher v. United States, 425 U.S. 391 (1976), the Court "h[eld] that compliance with a summons directing [a] taxpayer to produce the [taxpayer's] accountant's documents . . . involve[d] no incriminating testimony within the protection of the Fifth Amendment." Id. at 414. The Court clearly recognized the continuing validity of Boyd when it stated, "[w]hether the Fifth Amendment would shield the taxpayer from producing his own tax records in his possession is a question not involved here; for the papers demanded here are not

his 'private papers,' see Boyd v. United States, 116 U.S. at 634-35."  Fisher, 425 U.S. at 414; see also Shapiro v. United States, 335 U.S. 1, 16-18 (1948) (holding that records that are required by statute to be kept cannot be sheltered by the invocation of the Fifth Amendment).

As in Couch, the taxpayer in Fisher did not possess the documents -- a third party, the taxpayer's attorney, did.  Thus, the Court's "holding is that compelled production of documents from an attorney does not implicate whatever Fifth Amendment privilege the taxpayer might have enjoyed from being compelled to produce them himself."  Fisher, 425 U.S. at 402. Furthermore, the documents that were subpoenaed in Fisher were documents prepared by the taxpayer's accountant, not the taxpayer.  Accordingly, the Court said, "[w]e do hold that compliance with a summons directing the taxpayer to produce the accountant's documents involved in these cases would involve no incriminating testimony within the protection of the Fifth Amendment."  425 U.S. at 414 (emphasis added).  Stating that "[p]urely evidentiary (but 'non testimonial') materials, as well as contraband and fruits and instrumentalities of crime, may now be searched for and seized under proper circumstances," Fisher, 425 U.S. at 407, the Court nonetheless noted, however, that the question is open under the Fifth Amendment "'whether there are items of evidential value whose very nature precludes them from

being the object of a reasonable search and seizure.'"  Id. at 407 n.9.

After its decision in Fisher, the Court held "that the search of an individual's office for business records, their seizure, and subsequent introduction into evidence do[es] not offend the Fifth Amendment's proscription."  Andresen v. Maryland, 427 U.S. 463, 477 (1976).  In so holding, the Court specifically noted "that permitting the introduction into evidence of a person's business records seized during an otherwise lawful search would [not] offend or undermine any of the policies undergirding the privilege."  Id. at 475-76. Significantly, however, the Court "recognize[d], of course, that the Fifth Amendment protects privacy to some extent."  Id. at 477.  Indeed, the Court noted that the Fifth Amendment promotes the following societal values:

> "The privilege against self-incrimination
> . . . reflects many of our fundamental
> values and most noble aspirations:  our
> unwillingness to subject those suspected of
> crime to the cruel trilemma of
> self-accusation, perjury or contempt; our
> preference for an accusatorial rather than
> an inquisitorial system of criminal justice;
> our fear that self-incriminating statements
> will be elicited by inhumane treatment and
> abuses; our sense of fair play which
> dictates 'a fair state-individual balance by
> requiring the government to leave the
> individual alone until good cause is shown
> for disturbing him and by requiring the
> government in its contest with the
> individual to shoulder the entire load'
> . . . ; our respect for the inviolability of
> the human personality and of the right of

> each individual 'to a private enclave where
> he may lead a private life' . . . ; our
> distrust of self-deprecatory statements; and
> our realization that the privilege, while
> sometimes 'a shelter to the guilty,' is
> often 'a protection to the innocent.'"

Id. at 476 n.8 (emphasis added).  The Court again distinguished

Boyd by noting that Boyd concerned "private papers" and did not

"compel suppression of [the accused's] business records."  Id.

at 471-72.  Thus, Andresen implicitly leaves open the question

Fisher explicitly left open.  See 425 U.S. 407 n.9.

Still later, United States v. Doe, 465 U.S. 605, 606

(1984), "present[ed] the issue whether, and to what extent, the

Fifth Amendment privilege against compelled self-incrimination

applies to the business records of a sole proprietorship."  The

Court ruled that the contents of business records are not

privileged under the Fifth Amendment where the accused

voluntarily prepared the documents.  See id. at 610-11.

Answering the question not posed in Fisher, the Court held that

the content of business records, even in the possession of the

accused, are not privileged.  See id. at 611-12.  Although Doe

clearly involved business records, Justice O'Connor in a

concurring opinion interpreted the Court's opinion in Doe to

mean that "the Fifth Amendment provides absolutely no protection

for the contents of private papers of any kind."  465 U.S. at

618 (O'Connor, J., concurring).  Justice Marshall, however,

joined by Justice Brennan, adamantly disagreed and reasserted

the principle "that under the Fifth Amendment 'there are certain documents no person ought to be compelled to produce at the Government's request.'" 465 U.S. at 619 (Marshall, J., concurring and dissenting) (citation omitted). In short, although these cases refine the holding in Boyd, the Supreme Court has never overruled the core holding of Boyd.

Although the Commonwealth is correct in asserting that the Supreme Court has altered its Fifth Amendment analysis, my analysis of these cases clearly establishes that the Court has only done so with respect to business papers. The Court's basic holding in Boyd, as applied to private papers that are testimonial or communicative and that are in the possession of the accused, has never been reversed. As the Court held in Boyd, "any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of a crime or to forfeit his goods, is within the condemnation of . . . the Fourth and Fifth Amendments." 116 U.S. at 630. Indeed, the Court has noted in dicta on several occasions the unique privacy interest a person has in his or her personal papers when those papers remain in the person's possession. See, e.g., United States v. Dionisio, 410 U.S. 1, 11-12 (1973) (citing Boyd for the proposition that a grand jury "cannot require the production by a person of [incriminating] private books and records" and stating that on the facts before it, "no valid Fifth Amendment claim . . . [existed because

there] was no order to produce private books and papers"); Nixon v. Administrator of General Services, 433 U.S. 425, 455, 459-60 (1977) (indicating that had more of the documents the former President sought to protect from disclosure under the Presidential Recordings and Materials Preservation Act been private communications or personal diary dictabelts, then his First, Fourth, and Fifth Amendments claims would have had greater merit).  Other courts have agreed.  See, e.g., United States v. (Under Seal), 745 F.2d 834, 840 (4th Cir. 1985), vacated as moot, 471 U.S. 1001 (1985) (holding "in line with Boyd, that the fifth amendment prevents the government from subpoenaing an individual's incriminating papers that are in his possession and are held by him in an individual . . . capacity"); In Re Grand Jury Proceedings, 632 F.2d 1033, 1042 (3rd Cir. 1980) (holding that an accused's Fifth Amendment rights are violated if he is required to produce his personal "pocket diaries"); United States v. Boyette, 299 F.2d 92, 95 (4th Cir. 1962) (stating in dicta that "it has been thought that a diary in which its author has recited his criminal conduct, seized in an otherwise lawful search, should not be used against him, just as any other kind of involuntary confession is unusable under the Fifth Amendment"); United States v. Katin, 109 F.R.D. 406, 409 (D. Mass. 1986) (noting that "[i]ntimate personal papers such as private diaries, or drafts of letters or

essays, are not business records whose contents are unprotected by the Fifth Amendment").

In addition to Andresen, a case involving "business records," 427 U.S. at 477, the Commonwealth cites United States v. LeVasseur, 699 F. Supp. 965 (D. Mass 1988). However, LeVasseur relies upon Andresen, see 699 F. Supp. at 989. In United States v. LeVasseur, 619 F. Supp. 775 (E.D.N.Y. 1985), another case cited by the Commonwealth, the trial judge refused a motion to suppress on Fourth Amendment grounds "coded notebooks" seized from the accused. Id. at 791. The sparcity of the description of the items leaves in question the precise issue raised and decided.

The Commonwealth also cites State v. Andrei, 574 A.2d 295 (Me. 1990). There, the Supreme Judicial Court of Maine held that where the accused's husband delivered the accused's diary to government officials, no Fifth Amendment violation occurred. Thus, the court rested its decision on the fact that due to circumstances of the possession and delivery of the diary by a third party, the accused's "diary could be introduced at trial without any form of compulsion of the [accused]." Id. The decision in Andrei also relies on Andresen, which we have previously stated pertained solely to business records. See 574 A.2d at 299. Likewise, in People v. Willey, 303 N.W.2d 217 (Mich. Ct. App. 1981), the diaries were given to the police by a third party. See id.

The Commonwealth further argues that Moyer's diaries are not protected by the Fifth Amendment privilege against self-incrimination because Moyer was not compelled to produce them.  The distinction between being compelled to produce personal documents by subpoena, however, and having those same personal documents seized by the government, does not relieve the government of its obligation to avoid violating the Fifth Amendment rights of an accused.  See Hill v. Philpott, 445 F.2d 144, 149-50 (7th Cir. 1971) (holding that where production of the taxpayer's personal books and records would have properly been refused on the basis of Fifth Amendment privilege against self-incrimination if they had been sought by subpoena or summons, the fact that they were seized pursuant to valid search warrant did not preclude the taxpayer from claiming violation of his Fifth Amendment rights).  As stated by the United States Supreme Court in Gouled v. United States, 255 U.S. 298 (1921):

> In practice the result is the same to one accused of crime, whether he be obliged to supply evidence against himself or whether such evidence be obtained by an illegal search of his premises and seizure of his private papers.  In either case he is the unwilling source of the evidence, and the Fifth Amendment forbids that he shall be compelled to be a witness against himself in a criminal case.

Id. at 306.  This principle has been reiterated in subsequent cases.  See Agnello v. United States, 269 U.S. 20 (1925), and United States v. Lefkowitz, 285 U.S. 452 (1932), and is implicit

in the Court's rationale in both Warden v. Hayden, 387 U.S. 294 (1967), and Schmerber v. California, 384 U.S. 757 (1966).

As the Third Circuit has noted, "[t]he fifth amendment doctrine protecting an accused from producing incriminating private papers manifests its vitality by virtue of the Fisher court's explicit efforts to distinguish its facts from the facts in Boyd." In Re Grand Jury Proceedings, 632 F.2d at 1043 (citing Fisher, 425 U.S. at 414). Clearly, Andresen, which concerned the police search of an individual's office and seizure of business records is not controlling when the issue pertains to private diaries of a testimonial and communicative nature. Indeed, the Supreme Court recently emphasized the important constitutional distinction between "testimonial" and other communications:

> The term "privilege against self-incrimination" is not an entirely accurate description of a person's constitutional protection against being "compelled in any criminal case to be a witness against himself."
>
> The word "witness" in the constitutional text limits the relevant category of compelled incriminating communications to those that are "testimonial" in character. As Justice Holmes observed, there is a significant difference between the use of compulsion to extort communications from a defendant and compelling a person to engage in conduct that may be incriminating. Thus, even though the act may provide incriminating evidence, a criminal suspect may be compelled to put on a shirt, to provide a blood sample or handwriting exemplar, or to make a recording of his

voice.  The act of exhibiting such physical characteristics is not the same as a sworn communication by a witness that relates either express or implied assertions of fact or belief.  <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 594-598 (1990).  Similarly, the fact that incriminating evidence may be the byproduct of obedience to a regulatory requirement, such as filing an income tax return, maintaining required records, or reporting an accident, does not clothe such required conduct with the testimonial privilege.

<u>United States v. Hubbell</u>, ___ U.S. ___, ___ (2000) (Slip. op.). The aspect of the <u>Boyd</u> decision providing protection for diaries of a testimonial nature stands undisturbed.

For these reasons, I would hold that the trial judge's ruling that permitted the use of those diaries against Moyer at trial violated Moyer's rights under the Fifth Amendment.

I also disagree with the majority's interpretation of Code § 18.2-370.1.  During trial, the trial judge ruled that "buttocks" are "sexual . . . parts" within the meaning of Code § 18.2-370.1.  Moyer contends that ruling was error and that, because the evidence supporting five of the indictments proved only that "bare buttocks" were exposed, we should reverse those convictions on the ground that the evidence was insufficient. Moyer further contends that "evidence throughout the trial of paddling on buttocks and exposure of buttocks . . . flavored and colored the evidence regarding the other indictments," prejudically affecting all the other convictions.

Code § 18.2-370.1 provides as follows:

>    Any person eighteen years of age or older
>    who maintains a custodial or supervisory
>    relationship over a child under the age of
>    eighteen, including but not limited to the
>    parent, step-parent, grandparent,
>    step-grandparent, or who stands in loco
>    parentis with respect to such child and is
>    not legally married to such child, and who,
>    with lascivious intent, knowingly and
>    intentionally (i) proposes that any such
>    child feel or fondle the <u>sexual or genital
>    parts</u> of such person or that such person
>    feel or handle the <u>sexual or genital parts</u>
>    of the child, or (ii) proposes to such child
>    the performance of an act of sexual
>    intercourse or any act constituting an
>    offense under § 18.2-361, or (iii) expose
>    his or her <u>sexual or genital parts</u> to such
>    child, or (iv) proposes that any such child
>    expose his or her <u>sexual or genital parts</u> to
>    such person, or (v) proposes to the child
>    that the child engage in sexual intercourse,
>    sodomy or fondling of <u>sexual or genital
>    parts</u> with another person, or (vi) sexually
>    abuses the child as defined in
>    § 18.2-67.10(6), shall be guilty of a Class
>    6 felony.

(Emphasis added).

The trial judge concluded, and the majority now affirms, that our decision in <u>Hart v. Commonwealth</u>, 18 Va. App. 77, 441 S.E.2d 706 (1994), necessarily leads to the conclusion that "buttocks" are "sexual . . . parts" under the statute. In <u>Hart</u>, the accused was charged and convicted of indecent exposure under Code § 18.2-387, which makes it a misdemeanor to "obscene[ly] display or expos[e]" ones "person, or the private parts thereof, in any public place." See <u>Hart</u>, 18 Va. App. at 78, 441 S.E.2d at 706. Ruling that the meaning of the word "private parts" was

ambiguous, and consistent with well recited rules of statutory construction, we looked to other sections of our Code for guidance. See id. at 79, 441 S.E.2d at 707. This analysis supported the holding in Hart that the legislature intended "buttocks" to be "private parts" within the meaning of Code § 18.2-387. Id.

We face no such ambiguity here. Except for subsection (ii) and (vi), which are inapplicable in this case, Code § 18.2-370.1 clearly addresses conduct in which "sexual or genital parts" were either fondled, exposed, or proposed to be fondled or exposed. Unlike the term "private parts," which could have a number of meanings depending on the source of inquiry, I perceive no ambiguity in the meaning of "sexual or genital parts." "Sexual" is defined as "of or relating to the male or female sexes or their distinctive organs or functions." Webster's Third New International Dictionary 2082 (1981). "Sexual organ," a term relevant to any inquiry of the meaning of "sexual part," is defined as "an organ of the reproductive system; an external generative organ." Id. "Genital" is defined as "generative" and "relating to or being a sexual organ." Id. at 946. The definitions are clear, precise, and unambiguous.

> "Where a statute is unambiguous, the plain meaning is to be accepted without resort to the rules of statutory interpretation." "'Courts are not permitted to rewrite statutes. This is a legislative function.

> The manifest intention of the legislature, clearly disclosed by its language, must be applied.'"  Accordingly, we must "'take the words as written'" in Code § 18.2-370.1 and give them their plain meaning.

Krampen v. Commonwealth, 29 Va. App. 163, 167, 510 S.E.2d 276, 278 (1999).

Nothing in the definition of "sexual" or "sexual organ" supports the majority's conclusion that buttocks are "sexual . . . parts" within the meaning of Code § 18.2-370.1.  Buttocks are neither "an organ of the reproductive system," nor are they "an external generative organ."  Furthermore, buttocks do not "relat[e] to the male or female sexes or their distinctive organs or functions."  While a buttock may be a "private part," such that the legislature made it illegal to expose the buttocks under Code § 18.2-387, see Hart, I do not agree that buttocks are "sexual parts" under Code § 18.2-370.1.

I would hold, therefore, that the trial judge's finding tainted his ruling on the evidence.  I cannot say, however, that upon a proper consideration of the evidence, the convictions necessarily would be unsupported by sufficient evidence.  The evidence properly presented might establish that one who exposes his or her buttocks exposed his or her genitalia as well.  See State v. Fly, 501 S.E.2d 656, 659 (N.C. 1998) (holding that where the accused, wearing only a baseball hat and pants around his ankles, bent over so that his bare buttocks faced the complaining witness, a "jury could reasonably find . . . that

[the accused] had exposed . . . either his anus, his genitals, or both").  Because the trial judge ruled incorrectly, however, concerning the law, he made no findings on this point on each of the instances involving exposed buttocks.  Thus, I cannot conclude that if properly viewed, the evidence would have excluded this possibility.

For these reasons, I would reverse the convictions and remand for a new trial without permitting the use of the diaries at that trial.